Paul D. and Winona E. EDELMAN
v.
The UNITED STATES.

MINERS NATIONAL BANK OF WILKES-BARRE, Executor of the Estate of William S. McLean, and Ellen M. McLean
v.
The UNITED STATES.
Nos. 18-61, 19-61.

United States Court of Claims.
March 13, 1964.
Rehearing Denied June 12, 1964.

Sherwin T. McDowell, Philadelphia, Pa., for plaintiffs. Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., were on the briefs.

J. Mitchell Reese, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

These cases were referred to Trial Commissioner Wilson Cowen with instructions to report the facts and to recommend the conclusion of law to be entered, supported by an opinion. The commissioner has done so, and the cases are now before us on his report and on briefs and oral argument.

We are in thorough agreement with the findings and the conclusion reached by the commissioner and with much of his reasoning in reaching his conclusion. There are, however, certain general statements in his opinion with which we are not wholly in accord, which has prevented us from adopting his opinion as the opinion of the court, but we have leaned heavily upon it.

These suits, which were consolidated for trial, were brought to recover alleged overpayments of income taxes and interest for the calendar years 1955 and 1956.

Paul D. Edelman and William S. McLean are attorneys-at-law and will generally be referred to herein as plaintiffs, since their wives are parties to these suits only because they filed joint tax returns with their husbands.[1] During the year 1954, plaintiffs performed legal services in a contest over which of two wills of George P. Raser was entitled to probate. They had contracts for contingent fees of 20 percent of the amounts distributable to their clients. The fees were earned in 1954, when the will offered by their clients was admitted to probate, but not until 1955 and 1956 did plaintiffs receive their percentage of the amounts distributable to the beneficiaries whom they represented, paid partly in cash and partly in kind. Plaintiffs kept their books and records and filed their Federal income tax returns on the cash basis of accounting and by calendar years.

The sole issue to be resolved is whether plaintiffs received taxable income in 1954, the year their services were completed, or in 1955 and 1956, the years in which the amounts in issue here were actually received by them.

George P. Raser died on April 18, 1954. A written document dated April 2, 1954, purporting to be his last will and leaving his entire estate to Joseph J. Simner, was offered for probate. Mr. Raser also left a will dated May 6, 1942, in which he left the residue of his property to his relatives. On or about May 5, 1954, each of these legatees entered into a contingent fee agreement with plaintiffs to represent them in contesting the above-mentioned will of April 2, 1954. Under the agreement, plaintiffs were entitled to receive 20 percent of all moneys distributable to the beneficiaries out of the estate or received as a result of a settlement. In either event the executor of the estate was authorized to pay the fees directly to plaintiffs, charg-

1. Plaintiff William S. McLean died on June 19, 1963, after the commissioner's report was filed but before the cases were argued. The Miners National Bank of Wilkes-Barre, the executor of his estate has been substituted as plaintiff in his place. References herein to the plaintiff refer to the decedent wherever appropriate.

ing such payments to the administration of the estate and deducting them from the beneficiaries' distributive shares.

On September 14, 1954, the Orphans' Court of Luzerne County, Pennsylvania, approved a compromise settlement, under the terms of which Joseph Simner agreed to withdraw the will of April 2, 1954, in consideration of a payment of $80,000. The court then directed the probate of the 1942 will, and shortly thereafter letters testamentary were issued to the Tradesmens Bank and Trust Company, a Philadelphia bank, named as executor under that will.

Plaintiffs, on November 1, 1954, filed with the executor their fee agreements. Before making partial distribution pursuant to its first and partial account, which was filed with the Orphans' Court on May 17, 1955, the executor petitioned the court to authorize it to pay directly to the plaintiffs and their associates in the will contest their 20 percent of their clients' interest in the residuary estate, and to authorize the sale of sufficient shares of Smith, Kline & French Laboratories, Inc., to raise the cash needed therefor. However, in the latter part of July 1955, the executor filed in the Orphans' Court an amended petition, requesting authority to make distribution in kind to the residuary legatees and their attorneys. On August 29, 1955, the authorization for payment in kind was granted by the court and plaintiffs received 700 shares of the stock of Smith, Kline & French Laboratories on September 12, 1955, a year after the will had been admitted to probate and at a time when the fair market value of the stock had increased from $20.4166 per share (the value at the date of Raser's death) to $54.50 per share. Plaintiff Edelman sold his 700 shares in October 1955 and plaintiff McLean sold 525 of his 700 shares in March 1956.

A final distribution in kind consisting of 140 shares of the stock was received by each of the plaintiffs on April 14, 1956, two years after decedent's death and at a time when the market value of the stock was $55.50.

In addition, plaintiffs received in 1955 cash distributions of principal in the amounts of $4,853.34 and $4,853.33, respectively, plus comparatively small cash distributions of the income of the estate in both 1955 and 1956.

In their 1954 tax returns plaintiffs did not include in their income any part of the fees received for their services. In 1955 and 1956, they reported as income the cash and also the stock received in those years but at the value of the stock on the date of Raser's death in 1954. On the ground that the cash distributions were ordinary income in the year received, and that the stock was also ordinary income in the year received, to the full extent of its fair market value at the time received, the Commissioner of Internal Revenue asserted deficiencies against plaintiffs Edelman in the amounts of $10,551.33 and $2,318.66 for the years 1955 and 1956, respectively, and against plaintiffs McLean in the amounts of $12,848.51 and $1,212.28 for the same years. Plaintiffs paid the deficiencies, together with interest thereon, and filed timely claims for refund.

In their claims for refund and in these suits, plaintiffs have adopted a theory which differs from that used in their tax returns for the years in question. Plaintiffs now contend that they received no income at all from the distribution of cash and stock in 1955 and 1956, the years in which such distributions were actually received and reported in their tax returns. They assert that the contingent fee agreements constituted assignments to each of them of a 20-percent interest in the principal of the residuary estate, that such assignments became perfected on September 14, 1954, when the 1942 will was admitted to probate, that the reasonable value of 20 percent of the residuary estate was income to them on that date, and that subsequent actual distributions to them out of the principal of the estate in 1955 and 1956 was not income to them in those years. They say that any gain derived from an appreciation in value of this

stock should be recognized only if and when the shares were subsequently sold.

Plaintiffs rely on their fee contracts with the beneficiaries, which read in relevant part as follows:

"*    *    *    *    *

"And I do * * * agree to reimburse my said attorney for my proportionate share of all costs incurred under the authority herein contained and I do further * * * agree that, in the event my said attorney and/or his associates, shall be successful in having the purported will of George Prentice Raser, Deceased, dated April 2, 1954, declared invalid, or shall effect settlement resulting in the distribution of any monies to me or to my heirs, personal representatives or assigns, by the executor or administrator of George Prentice Raser, Deceased, or by Joseph J. Simner, or his personal representatives, heirs or assigns 'I will pay unto my said attorney a contingent fee of twenty percent (20%) of all monies distributable to me out of said estate or received by me as a consequence of such settlement.'

"*    *    *    *    *

"In the event the 1954 will shall be legally determined to be invalid or the controversy regarding the same shall be terminated by settlement, I do hereby authorize the executor and/or administrator of the estate of George Prentice Raser, Deceased, to pay my said attorney or attorneys the contingent fee and costs herein agreed to be paid by me and to charge the same against the costs of administration of said estate and to deduct the same from my distributive share of said estate, and this shall be its sufficient and full authority for such payment and for such deduction and shall be binding upon me, my heirs, personal representatives and assigns.

"*    *    *    *    * "

Plaintiffs say these instruments were assignments to them of a 20 percent interest in their clients' shares in the residuary estate. We do not agree. We think each was nothing more than a promise to pay 20 percent of the amount their client received, secured by an authorization to the executor to pay said amount to plaintiffs. Each instrument reads: "I will pay unto my said attorney a contingent fee of twenty percent (20%) of all monies distributable to me * * * as a consequence of such settlement." When the settlement was effected, each residuary legatee became entitled to a certain part of the residuary estate, less debts, taxes and costs of administration. Out of this each promised to pay to his attorneys 20 percent thereof. There were no words of transfer or conveyance, merely a promise by the legatees to pay a percentage of his share to his attorneys, and an authorization, but not a direction, to the executor to pay it as a part of the cost of administration and to deduct it from the legatee's share.

When this agreement was made, it was uncertain whether the legatees under the 1942 will would receive anything. Even after the settlement of the estate had been agreed upon, the share of each legatee had to be legally determined, the assets of the estate had to be reduced to possession, the debts had to be determined, the taxes, both state and Federal, had to be settled, and cost of administration ascertained. Only after this had been done could full distribution be ordered. Only then did plaintiffs become entitled to receive their fees.

Note the difference between this case and Blake v. Commissioner, 20 T.C. 721 (1953), upon which plaintiffs rely: in Blake there was a present, unconditional conveyance effected in the following words:

"In consideration for the services heretofore performed and to be performed * * * I hereby bargain, sell and convey unto Mr. Blake an undivided one-fourth (¼th) part of all of my right, title and interest in said tract of land, * * *."

There are no such words of conveyance in the case at bar. Here there was a mere promise to pay a percentage of the share awarded to each beneficiary. The attorneys' right did not mature until the awards were made to their clients.

However, plaintiffs assert that the fee agreements were assignments because the Orphans' Court found them to be such. On August 29, 1955, the court said:

> "In our opinion, each agreement constitutes an assignment of the particular beneficiary's interest in the residue of this estate up to twenty percent (20%) of "all moneys distributable" to such beneficiary from this estate."

■ This declaration of the Orphans' Court was not necessary in the administration of the estate; it had no effect on the settlement of it; whether the agreements were assignments or mere promises to pay, the result was the same. Calling them assignments made no difference; distribution of the assets of the estate was not affected by whatever name they were called. The Orphans' Court's opinion that they were assignments had relevance only in determining liability for Federal taxes, and hence it is not binding here. See Note, The Role of State Law in Federal Tax Determinations, 72 Harv.L.Rev. 1350 (1959).

The 3d Circuit Court of Appeals in Gallagher v. Smith, 223 F.2d 218 (3d Cir. 1955), relied upon by plaintiffs, properly held that the effect of a state court determination, that a taxpayer had only a one-thirtieth interest in the income of a trust rather than the entire interest, was binding on a Federal court in deciding how much of the trust income was taxable to her. But the court recognized that when a state court has not determined the taxpayer's entitlement to property as against the claims of others but "has merely made a determination of some other question of law or fact asserted to be involved in the federal tax case," (Id. at p. 222) the Federal court may freely disregard what the state court has done. Here the decision of the Orphans' Court did not serve to adjudicate plaintiffs' rights to property as against adverse claimants; it was in the nature of an advisory opinion to some future Federal court that might consider the tax consequences of plaintiffs' claims on the estate.

■ But, our holding that the instruments were not assignments does not necessarily determine the question whether the fees were includible in income in 1954, when the 1942 will was admitted to probate. A taxpayer on the cash receipts and disbursements basis, commonly called the cash basis, must report as income all receipts of cash or its equivalent in the year of receipt. The question before us is whether these agreements were the equivalents of cash; otherwise stated, were they readily convertible into cash?

■■ A chose in action cannot represent income when received by a cash basis taxpayer unless it is embodied in a written instrument (Ruprecht v. Commissioner, 16 B.T.A. 919 (1929), aff'd 39 F.2d 458 (5th Cir. 1930)) and unless the amount of the obligation is ascertainable in the taxable year, and the instrument can be readily converted into cash in the ordinary course of business, and not wholly as a speculative matter. In The Denver & Rio Grande Western R. R. Co. v. United States, Ct.Cl., 318 F.2d 922, 926, we said, " * * * an obligation to pay in the future can have a current market value, or represent current income, only if it is currently capable of somehow being traded, disposed of, or realized—i. e., negotiated, assigned, transferred, or paid." The purpose of this test is to prevent inchoate interests from being taxable at a stage when the value of such interests is wholly speculative and to avoid thrusting both taxpayers and the Government into "the briarpatch of valuation-sans-market." Id. 318 F.2d at 928. When this test of taxability is applied, it is clear that the contingent fee agreements held by plaintiffs were not the equivalent of cash either on

May 5, 1954, when they were executed, or on September 14, 1954, when the 1942 will was probated.

The contract rights which plaintiffs received by virtue of the contingent fee agreements were conditional executory rights to receive a percentage of an estate subject to a will contest. Although this contest was settled on September 14, 1954, the net value of the estate could not have been determined until after due notice to creditors, known and unknown, to file their claims and the time allotted to them to do so had expired, nor until Federal estate taxes and state inheritance taxes and the cost of administration had been determined. In no event could there have been a full distribution of the estate until all of these things had been done. Any distribution before hand was at the peril of the executor, and could not have been compelled. The interests of these plaintiffs could not have been reduced to cash in 1954; they were entirely too speculative to permit ready saleability.

Legal notice of the probate of the estate (required by the laws of Pennsylvania) was not given through advertisements in newspapers until May 19, 1955. Unknown creditors might have appeared as a result of such advertisements with claims which would have had to be satisfied. The claims of the state and Federal tax authorities constituted prior claims against the assets of the estate, and the amount of these claims had not been determined in 1954. The Federal estate tax could not be determined until April 18, 1955, for prior to that time no decision had been made whether to value the assets of the estate as of the date of decedent's death or within one year thereafter.[2]

Furthermore, the record shows that in August 1955, almost a year after the date on which plaintiffs claimed their property rights vested, the executor retained approximately $204,000 of the funds of the estate in its hands "for a further administration and accounting to be made upon completion of an audit by the Federal Government of the Federal estate tax return and of decedent's income tax returns for 1953 and 1954, the payment of any additional taxes to the Commonwealth of Pennsylvania and any additional administrative costs in connection with the transfer of securities."

In view of these facts, it cannot be said that plaintiffs, who kept their accounts on a cash basis, constructively received in 1954 the income in dispute.

It is conceded, of course, that the stock had a fair market value when distributed to plaintiffs. It was the equivalent of cash and therefore income was realized when the stock was received.[3]

The second issue presented affects only the plaintiffs in docket No. 18–61. The question is whether the total premiums paid for health and accident insurance policies were properly deductible as expenses for medical care. Defendant conceded in open court that the total premiums paid are deductible as expenses for medical care. Subsequently, defendant confirmed its concession by letter to the court. Judgment will be entered for the plaintiffs in No. 18–61 on this count of their petition.

It follows from the foregoing that plaintiffs in docket No. 19–61 are not entitled to recover and that their petition will be dismissed; that plaintiffs in docket No. 18–61 are not entitled to recover on the cause of action asserted in Count

2. Plaintiffs contend that, even though the alternate valuation date provided in section 2032 of the Internal Revenue Code of 1954 had not passed in 1954, the maximum size of the Raser estate for estate tax purposes was fixed as of the date of his death. Even though this eventually turned out to be the case, the executor might well have selected the higher estate tax value as of a year after the date of death in order to increase the basis of the estate's assets in the hands of the distributees or for other sufficient reasons. See Internal Revenue Code for 1954, § 1014; See also Casner, Estate Planning 86, 810 n. 51 (3d ed. 1961).

3. Treas.Reg. § 1.61–2 (1957) (amended by T.D. 6416 (1959); T.D. 6696 (1963)).

I of the petition, and the petition as to it is dismissed, but that they are entitled to recover on the cause of action contained in Count II of their petition. The amount of such recovery is to be determined pursuant to Rule 38(c).