**O. H. DESHOTELS, Jr., and Fay C. Deshotels, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 31093.**

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1971.

As Amended Feb. 4, 1972.

1. See N.L.R.B. v. Amalgamated Clothing Workers of America, 5 Cir. 1970, 430 F.2d 966.

Gerald Gallinghouse, U. S. Atty., Robert H. Shemwell, Asst. U. S. Atty., Shreveport, La., Charles G. Barnett, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., Johnnie M. Walters, Scott P. Crampton, Asst. Attys. Gen., Meyer Rothwacks, Grant W. Wiprud, William K. Hogan, Attys., Tax Div., Dept. of Justice, Washington, D.C., Donald L. Walter, U. S. Atty., of counsel, for defendant-appellant.

Bob F. Wright, Domengeaux, Wright & Bienvenue, Gerald I. Hebert, Lafayette, La., O. H. Deshotels III, Kaplan, La., for plaintiffs-appellees.

Before TUTTLE, WISDOM, and INGRAHAM, Circuit Judges.

WISDOM, Circuit Judge:

The question this appeal presents is whether an attorney may deduct depletion allowance from funds realized in 1962 through litigation of oil and gas rights under a 1956 contract describing his interest as "a contingent fee coupled with an interest".

O. H. Deshotels, the taxpayer, an attorney in Kaplan, Louisiana, represented Casey Pierce, the owner of mineral rights subject to a lease held by Atlantic Refining Company. Atlantic had drilled a producing well on land not owned by Pierce but within the same unit under a state unitization order. In October 1956 when Atlantic failed to pay royalties to Pierce, Deshotels sent Atlantic a written demand for cancellation of the lease. October 29, 1956, Deshotels and Pierce executed a contract reading in pertinent part, as follows:

That the said Landowner does hereby employ the said Attorney for the purpose of suing or obtaining a compromise with respect to the voiding of certain leases executed by David White on October 10, 1950, affecting 15 acres, more or less; and that certain lease dated October 10, 1950, executed by Casey Pierce, affecting 9.25 acres, more or less, all situated in Section 37, township 14 south, range 3 east, Vermilion Parish, Louisiana.

It is agreed and understood that no compromise will be made without the consent of both parties hereto and that no expense will be borne by the said Landowner for any portion of the law suit or compromise.

For and in consideration of the above services the said Attorney is to be paid one-third (⅓rd) interest in any settlement or judgment obtained in the matter.

This is designated as a contingent fee coupled with an interest.

Upon Atlantic's refusal to cancel the leases, Deshotels sued on behalf of Pierce to have the leases cancelled. Atlantic prevailed in the trial court, but in 1962 the Louisiana Court of Appeals for the Fourth Circuit reversed the trial court's judgment, declared the leases null and void, and directed Atlantic to account to Pierce for all production from his property. Later in 1962 by an agreed accounting, Atlantic paid $169,377.25, representing the value of the minerals allowable to Pierce's interest minus a proportionate share of development and production expenses. Of this amount, Deshotels received $56,125.75; in addition he received an attorney's fee of $5000 from Atlantic. Pierce then gave to Deshotels a formal deed to one third of his seven-eighths interest in the mineral property.

In his 1962 tax return Deshotels listed the $5000 fee as ordinary income, but reported the $56,125.75 as depletable income from oil and gas production. He included no amount for the fair market value of the mineral interest deeded to him in 1962. He adopted this approach on the theory that the 1956 contract gave him a present interest in the minerals in place and that the 1962 deed was merely confirmatory.

The Commissioner disallowed Deshotels' deductions for depletion allowance, determining that the cash received in 1962 was simply a legal fee. In addition, the Commissioner determined that Deshotels should have included in his 1962 return the fair market value of the mineral interest deeded to him in that year.

Deshotels paid the assessed tax and sued in the district court for a refund. The district judge permitted the taxpayer and the client to testify as to their intention in signing the 1956 contract. Each testified that in the 1956 contract they had intended a transfer of title from Pierce to Deshotels of one third of Pierce's interest in the mineral property.[1] The district judge made the following finding of fact:

> Their understanding and specific intention was that Pierce was then and

there transferring and O. H. Deshotels, Jr. was acquiring a ⅓rd interest in ⅞ths of Pierce's minerals. The parties recognized that the ⅞ths interest was then covered by an outstanding lease to Atlantic Refining Company which they felt had been terminated by Atlantic's failure to pay royalties. They further recognized that even if the lease was not terminated by the state court suit, the ⅞ths mineral interest might eventually revert to Pierce by forfeiture, other nonperformance, or otherwise, and Deshotels' ⅓rd interest therein would be more valuable. They agreed that their contract would not be recorded so that Deshotels would not have to be made a party to the lease cancellation suit.

On the basis of this finding,[2] the court concluded that Deshotels was enti-

---

1. Pierce testified to the following effect:

Q: * * * what was meant by this phrase, coupled with an interest with regard to this contract?

A: Well, sir, as I understood it at that time and that is what I meant it to be was he would then own a part of that seven-eights interest in the minerals.

Q: Was it brought up or did you discuss the possibility of Mr. Deshotels in fact transferring to some third person or persons a part of his interest or all of his interest?

A: Yes, sir. We did.

Q: Was this acceptable to you?

A: Yes, sir. It was.

Q: Did you realize that upon signing that contract that one-third of your interest was lost to you?

A: Yes, sir. I did.

* * * * *

Q: You felt that as of the time you signed that agreement Mr. Deshotels owned one-third of your interests?

A: Yes, sir. That is correct.

Deshotels also testified, to the following effect:

Q: Well, did you agree upon a settlement for the services rendered, the expenses you had incurred and the work you would do on the lease suit?

A: Yes, sir, at that time I told him that if he wanted to he could give me an interest in the minerals at the time and I would go ahead and try to write a letter and get them to release it to him

because I thought they were in the wrong on it, legally. Our intention then, was exactly expressed in there. He interest was mine at the time. We also discussed the gave me the interest at that time. I put in there that it was contingent fee coupled with an interest and the fact that I had a lot of out-of-pocket money on it and I would probably have to spend some more money and if I needed to, I would like to be able to sell some of mine. We discussed that in the office, he and I, and we agreed that I could sell it anytime I wanted to.

2. Pierce's 1962 tax return reported the entire value of the minerals produced by Atlantic as gross income. From this amount he deducted gross operating expenses—the entire amount retained by Atlantic as reimbursement for development and production expenses—and "other expenses connected with the property"—in which he included the cash paid to Deshotels. Additionally, in computing his depletion allowance, Pierce took a percentage of the gross value of the minerals, including the amount paid to Deshotels. This treatment was consistent with the theory that Pierce owned all the mineral rights until 1962.

The trial judge believed that this information did not belie Pierce's testimony about his intention to convey the interest to Deshotels in 1956 contract. Testimony at the trial showed that the

tled to take depletion deductions on the cash realized from the 1962 accounting and that the value of the mineral rights need not have been included in Deshotels' 1962 gross income. We reverse the judgment of the district court.

The contract between Deshotels and Pierce must first be considered in light of existing federal precedent. In Blake v. C. I. R., 1953, 20 T.C. 721, an attorney agreed to represent a client in attempting to regain title to certain land and its attendant mineral rights. At the time of the agreement they drew up a contract defining the rights and duties of the attorney and the client. The contract included the following language:

> In consideration for the services heretofore performed and to be performed by Mr. Blake as my said attorney, *I hereby bargain, sell, and convey* unto Mr. Blake an undivided one-fourth (¼th) part of all my right, title and interest in said tract of land, *and* in all the settlements, benefits and proceedings arising therefrom.   *   *   * (Emphasis added.)

Later the client executed and recorded a confirmatory deed to the attorney. The tax court found that the contractual language conveyed a present interest in the land and mineral rights to the attorney. The court therefore concluded that the attorney was entitled to deduct depletion allowance from the cash recovery he received for past production when litigation was successfully concluded.

*Blake* is significant because it emphasizes the clarity with which the attorney's present interest was granted to him by the client. "The language in the agreement was unequivocal," the Tax

Court stated. It then continued: "The agreement must speak for itself, and it speaks as a conveyance of a present interest to petitioner." [3] Thus *Blake*, the only federal case directly in point with the present set of facts, allowed a deduction only upon an agreement not ambiguous on its face.

■■ The application and interpretation of the Internal Revenue Code is a matter of federal law. The form of a document and its effect under state law are therefore not controlling in these federal determinations. Burton-Sutton Oil Co. v. C. I. R., 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062. We may, however, look to Louisiana law in this case to assist us in understanding the Deshotels-Pierce agreement which forms the nucleus of this dispute. Unfortunately for Deshotels, Louisiana law does not support his interpretation of the agreement with Pierce any more than the *Blake* case constitutes federal precedent for Deshotels' view of that agreement.

The Louisiana cases distinguish two broad categories of attorneys' "interests" in client property which is the subject matter of litigation by the attorney on the client's behalf. These rights have been considered not with respect to tax consequences but instead with respect to the effect of attorney-client contracts upon the attorney's property rights and his right to prevent his client from unilaterally ending litigation when the attorney's fee is dependent on the outcome.

An attorney-client contract unequivocally granting the attorney a present possessory interest in the client's property was considered by the Louisiana

return was prepared by an accountant. Therefore the treatment of these items on the return did not necessarily reflect Pierce's understanding of the facts.

3. It is true that the court in *Blake* noted that "[t]here is no evidence indicating an intent of the parties contrary to the express language in the agreement." This statement was only dictum. In addition, extrinsic evidence in *Blake* would have

been introduced *against* the taxpayer, who asserted his reliance on the words of the agreement. We do not therefore feel compelled by *Blake* to approve the sufficiency of self-serving parol evidence to sustain a taxpayer's interpretation of a contract when the words of that contract have a contrary accepted meaning under state law, as they do here.

Supreme Court in McClung v. Atlas Oil Co., 1921, 148 La. 674, 87 So. 515. McClung employed Huey P. Long to clear title to mineral property. The contract included the following language:

> In consideration of the professional services of the said Huey P. Long, Jr., in bringing whatever action or actions he may deem necessary, in order to secure judgment in favor of said McClung for the mineral rights as above set out, and in further consideration of the said Long paying whatever court costs decreed against said McClung in said suit or suits, the said McClung does by these presents, transfer, set over and deliver to the said Huey P. Long, Jr., one-half of his undivided one-half mineral rights of the property described above and in this instrument, excepting a 1/16 royalty on all the property described herein.

Long recorded the contract in the conveyance office. Thereafter McClung settled with those who claimed to have a lease on his property. Long sought to continue the litigation in his own name. In considering this issue the Supreme Court said

> As we read the contract, it was not alone a transfer of an interest in the subject-matter of the contemplated lawsuit, but it was a present conveyance of a fixed undivided interest in such title as McClung then owned in the mineral rights of the property described.

The Court held that Long had a vested title to the portion of the property conveyed to him in the employment contract and that therefore he could litigate as to that interest in his own name. The compromise by the client could in no way affect Long's vested property rights.

*McClung* discussed not an agency relationship but the conveyance of full title to an interest in minerals. The conveyance was payment for promised future legal services. The *Blake-McClung* type

of transaction is distinguishable from another type of transaction which creates an agency relationship but no present possessory interest. Here the direct impact of the transaction is not to create property rights in the attorney but to make irrevocable the principal's grant of authority to the agent.

A number of Louisiana cases, often in dictum, have recognized a true "mandate coupled with an interest". This is an irrevocable agency relationship in which the power of the agent continues even beyond the death of the principal. It is accomplished by conveying to the agent legal title in the thing which is the subject of the agency so that he may deal with it in his own name. Thus, for a mandate to void a mineral lease attaching to the client's ownership of property, the client might convey title to the property to the attorney, so that the attorney may sue in his own name to have the leasehold voided. See Louque v. Dejan, 1911, 129 La. 519, 56 So. 427.

A similar type of agency transaction is provided for in La.R.S. 37:218, Act 124 of 1906, which states,

> By written contract signed by the client, attorneys at law may acquire as their fee an interest in the subject matter of the suit, proposed suit, or claim, in the prosecution or defense of which they are employed, whether the suit or claim be for money or for property. In such a contract of employment it may be stipulated that neither the attorney nor the client may, without the written consent of the other, settle, compromise, release, discontinue or otherwise dispose of the suit or claim. * * *

The effect of the statute was two-fold: first, to legitimize the contingency fee contract, allowing the attorney to sue for his fee after successfully litigating his client's claim; second, to allow the parties to agree that the client cannot unilaterally end the litigation. In adjudicating contracts under this statute the Louisiana courts have held that contrac-

tual language to the effect that the attorney has a vested right in a portion of the expected recovery does not in fact presently vest anything. *See* Tennant v. Russell, 1949, 214 La. 1046, 39 So. 2d 726. As the Court said in Succession of Vlaho, La.App.1962, 140 So.2d 226,

> * * * the attorney has no vested interest in the client's suit or claim and obtains no vested interest therein even where the contract in express terms grants such an interest to him.

Rather, that court said, the only effect of such a contract is to limit the ability of the client to end the litigation unilaterally. Consistent with this approach, the Court in Robinson v. Hunt, 1946, 211 La. 1019, 31 So.2d 197 (on rehearing), after recognizing the efficacy of contractual language, held only that the client could not dismiss the suit; the Court rejected the alternative of allowing the attorney to continue the litigation in his own name with respect to his contractual portion of the matter in issue. The Court implicitly considered the attorney not to have vested title to the mineral property involved in the suit. Similarly, in Land v. Acadian Production Corp., W.D.La.1944, 57 F.Supp. 338, the court considered an attorney fee contract which "conveyed" to the attorney a percentage of the expected proceeds of the suit. There the question was whether the proceeds earned by the attorney had vested before his divorce, which occurred between the signing of the contract and the end of the litigation. The court held that no title vested under the contract until the completion of the litigation.

■ Our task is to decide whether either of the two broad categories fairly characterizes the agreement entered into by Deshotels and Pierce—the unequivocal conveyance involved in *McClung*, or the mandate coupled with an interest which gives the attorney title to property only as the agent of the equitable owner. Deshotels argues that the phrase "coupled with an interest" is synonymous with the "transfer, set over, and deliver" language of the *McClung* agreement (and the "bargain, sell, and convey" language of *Blake*). But the cases do not support this assertion. The contingent fee "coupled with an interest" is, as we read the Louisiana jurisprudence, language indicative of a special agency relationship and not a transfer of a present possessory interest.

We do not isolate the final phrase. Other language in the Deshotels contract supports our interpretation of the agreement. The document recites that "no compromise will be made without the consent of both parties". The sentence sets forth the attorney's right to prevent a compromise. This is the hallmark of a mandate coupled with an interest. Moreover, the agreement provides that Deshotels "is to be paid one-third (⅓) interest in any settlement or judgment obtained in this matter." That is, the document contemplates future reimbursement ("is *to be paid*") and reimbursement from the proceeds of any legal victory ("One third interest *in any settlement or judgment obtained*").

■ Deshotels' legal position, then, rests upon one phrase—the designation of the agreement as a "contingent fee coupled with an interest". Since that phrase will not itself suffice to show a present transfer either under Louisiana or federal precedent, Deshotels' case boils down to this: Although on its face the agreement bears every indication of establishing no present interest in mineral wealth, since the parties to the agreement testified that they intended to create such an interest, a depletion allowance must be permitted on the basis of that testimony. We cannot accept Deshotels' position as a sound approach to the mineral depletion provisions of the Internal Revenue Code. Under Louisiana law, it is true that parol evidence is admissible to explain written contracts (Snow-White Roofs, Inc. v. Boucher, La.App.1966, 182 So.2d 846) and even to reform written contracts when the writing does not conform to the

true intent of the parties (Fontenot v. Lewis, La.App.1968, 215 So.2d 161). But parol evidence is most often admitted under state law to resolve disputes in which the parties to the contract are themselves the disputants over the meaning of the contract. The adverseness of the contracting parties provides substantial assurance that extrinsic evidence introduced by one of the parties will be challenged by the other; or, if not challenged, that the extrinsic evidence is not crucial to a proper resolution of the contractual dispute. The scenario is altogether different when the Government asserts a claim for revenues based upon a document giving rise to financial advantage on the part of one of the parties to that document. The parties to the document are not adverse parties. Indeed, here the existence of a financial relationship between the parties is reason to suppose that the parties may wish to promote a spirit of sympathetic cooperation with an eye to further mutual needs.

To admit parol evidence of the parties without the guarantee of adverseness between them would put the Government to a most severe task if it wished to collect its revenues based upon the document in question. The taxpayer could avoid taxation either by showing that the agreement supports his position on its face, or, failing that, simply by showing that the intention of the parties was contrary to the meaning of the document. Allowing the taxpayer to prevail upon parol evidence alone would be undesirable for two reasons. First, there would be strong incentive for manufactured testimony. Second, if parol evidence alone would sustain the taxpayer's burden of proving his right to a deduction, that burden would be so slight as to be virtually non-existent. At the same time, the Commissioner would face the insuperable task of demonstrating that the taxpayer did not intend a document to operate as the taxpayer says he did. The drastic effect of this adjustment in responsibilities for proof would cast upon the government the burden of proving that the taxpayer was not enti-

tled to a deduction. To do so would be contrary to a longstanding law of taxation as it has been developed by the federal courts. United States v. Olympic Radio and Television, Inc., 1955, 349 U. S. 232, 235, 75 S.Ct. 733, 736, 99 L.Ed. 1024.

Perhaps parol evidence would be enough to tip the scales toward the taxpayer's interpretation in a case where he had offered substantial corroborating evidence in addition to the testimony of the contracting parties in support of his position. Parol evidence might be sufficient in and of itself if there were strong support on the face of the document for the taxpayer's interpretation; here the words themselves are very clearly in the Commissioner's favor. We need not decide these questions today. We hold only that the taxpayer cannot sustain the burden of proving his right to a deduction merely by introducing parol evidence to controvert the traditional state law meaning of the words of a contract affecting the taxpayer's federal tax liability.

Since the taxpayer did not acquire an economic interest in Pierce's minerals until 1962, his share of the 1962 recovery from Atlantic was taxable to him as a legal fee, and the fair market value of the interest acquired in 1962 was includable in his income for that year. The government set the fair market value of taxpayer's one-third (⅓rd) of seven-eighths (⅞ths) of the mineral interest at $58,424.40 and the taxpayer was taxed on that amount. However, at the trial it was stipulated between the taxpayer and the Government that the accurate fair market value of the mineral interest was $45,800.00. Accordingly, the taxpayer is entitled to reimbursement of taxes, plus interest, on the difference between these evaluations, that is, on $12,624.40. The judgment of the lower court is therefore REVERSED insofar as it ordered the Government to refund taxes and interest over and above the taxes and interest on the taxes paid on the amount of $12,624.40, for the reasons stated above.