Jack H. VESTAL and Mary S. Vestal,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

John T. DANIEL and Thase F. Daniel,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

Nos. 73–1588, 73–1589.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1973.

Decided May 1, 1974.

Rehearing and Rehearing En Banc
Denied June 12, 1974.

rights to obtain a partnership share of the oil and gas field. On his income tax returns for each of those years, Vestal seeks to treat these sums as capital gains rather than as ordinary income. The Commissioner of Internal Revenue denied these claims. Vestal paid the tax and sued for a refund in the United States District Court for the Western District of Arkansas. That court granted Vestal relief. We reverse, holding the payments taxable as ordinary income.

In a related case, taxpayer John T. Daniel,[2] an investor in the same Canadian oil field, sought to deduct as an income expense the sum of $25,422.54, paid to Vestal in 1964 and 1965 in satisfaction of Vestal's contract right to receive a share of Daniel's limited partnership interest in the oil and gas field. Daniel claimed he paid this money in the taxable years in question as compensation for investment advice which he had received from Vestal relating to the Canadian oil field. The Commissioner disallowed the claimed deduction as an expense, ruling that the questioned payment should be accounted for as a capital expenditure, i. e., a commission or finder's fee to be added to the basis of the property obtained by Daniel through Vestal's efforts. On Daniel's refund suit, the district court sustained the taxpayer and the Government brings this appeal. We also reverse this decision.[3]

The present tax questions arise out of investments made in the Olds Gas Field located in south central Alberta, Canada. According to the record, Robert M. Leibrock and four associates had formed Olds Holdings, Ltd. in 1961 to purchase a leasehold interest from Shell Oil Company in six shut-in wells and 60,000 acres of the Olds Gas Field for $50,000 in cash plus 15 percent of the gross in-

Louis A. Bradbury, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Jerry T. Light, Little Rock, Ark., for plaintiffs-appellees.

Before BRIGHT and STEPHENSON, Circuit Judges, and STUART, District Judge.*

BRIGHT, Circuit Judge.

In 1962, cash basis-taxpayer Jack H. Vestal[1] obtained contract rights to receive in the future a fractional share of a partnership in a Canadian oil and gas field development in return for services rendered to certain of the limited partners in an oil development partnership, Olds, Ltd. The oil and gas rights were subsequently sold, and Vestal received installments of $8,143.81 in 1964, $129,984.39 in 1965, and $1,602.15 in 1966 in satisfaction of his contract

---

* WILLIAM C. STUART, District Judge, South District of Iowa, sitting by designation.

1. Mary Vestal, taxpayer's wife, is a party by reason of their filing a joint tax return.

2. Mrs. Daniel is likewise joined as a party because of the joint income tax return.

3. The combined district court opinion dealing with the Vestal case and the Daniel case is unofficially reported at 73–1 U.S.T.C. ¶9260 (W.D.Ark.1973).

come from the fields up to $700,000. In addition, Shell retained a ten percent overriding royalty.

Thereafter, Olds Holdings, Ltd. undertook a two-step plan for developing this oil and gas acreage for commercial purposes. The plan initially envisioned the formation of a limited partnership known as Olds, Ltd. composed of Leibrock and his associates from Olds Holdings, Ltd., who would serve as general partners and contribute their oil and gas interests in the Olds Field. They would then seek other investors who would subscribe one million dollars to Olds, Ltd. and own 50 percent of the venture as limited partners. The second stage of the plan called for the drilling of additional wells to establish the adequacy of reserves in order to satisfy the needs of any potential purchaser of gas. After obtaining a satisfactory gas sales contract, Olds, Ltd. planned to construct and operate a gas purification plant to remove excess hydrogen sulfide and carbon dioxide from the "sour" gas and market the resultant "sweet" gas and other by-products produced by this plant.

In November of 1961, taxpayer Vestal, a consulting engineer and geologist, first learned of the plan of Leibrock and his associates to develop the Olds Gas Field. At this time certain individuals had contributed about three-fourths of the needed capital of one million dollars to Olds, Ltd. and had joined the venture as limited partners. Vestal proposed to raise the remainder of the needed capital from his own clientele who resided in his home town of El Dorado, Arkansas. Accordingly, Vestal interested four El Dorado residents, including Daniels, in investing a total of $235,000 in the venture. Each of these four persons (hereinafter the El Dorado investors) subsequently became a limited partner in Olds, Ltd. For his efforts in presenting the investment opportunity to the El Dorado investors, Vestal received a separate contract agreement from each of them. These agreements provided that each investor would deliver to Vestal a proper conveyance of one-eighth of his interest in the Olds, Ltd. partnership:

> [F]rom and after the time the [El Dorado investor] has received from the proceeds of the sale of oil, gas, distillate, sulphur and other minerals from the interests acquired in said limited partnership, the entire costs incurred by [the investor] in drilling, developing, producing and operating the properties acquired by said limited partnership * * *.

However, these agreements stipulated that Vestal must obtain the consent of the general partners in order to become a participating limited partner in Olds, Ltd., and, as noted above, any El Dorado investor would not convey any part of his limited partnership interest to Vestal until such investor had recovered his initial investment and any future investment in Olds, Ltd., plus six percent interest compounded semi-annually.

The respective limited partnership agreements of the El Dorado investors in Olds, Ltd. and their contracts with Vestal were executed in 1962. Olds, Ltd. undertook some development in the Olds Field, drilling additional wells in 1962 and 1963, but capped them for want of a purchaser of any gas production. In June of 1964, the general partners pursuant to authority vested in them under the Olds, Ltd. partnership agreement, sold the partnership interests in the Olds Gas Field to Amarada Petroleum Company for approximately eleven million dollars. The purchase price was to be paid in three yearly installments from 1964 to 1966 and the proceeds divided equally between the general partners as a group and the limited partners as a group.

## I.

## VESTAL'S CLAIM

Each of the El Dorado investors, after receiving his share of the purchase price from the sale to Amarada and then deducting the amount of his investment plus compounded interest, issued a check

to Vestal for one-eighth of the remaining balance. Vestal reported these sums as long term capital gain income on his individual income tax returns for each year.

The trial court judge, after hearing testimony and examining the written contracts and other documentary evidence, found that at the time the contracts were executed in June of 1962 the fair market value of the collective interest obtained by Vestal from the contracts with each El Dorado investor amounted to $29,375. He also found that the interests derived from these agreements constituted capital assets which were sold or exchanged in 1964. Accordingly, the court directed that his gains from this transaction be taxed at long term capital gain rates, using the $29,375 value in 1962 as the basis for the property exchange in computing the gain.

On this appeal, both parties concede that amounts received as compensation for personal services, whether paid in cash or kind, constitute ordinary income in the year which they are actually received. *See* Treas.Reg. § 1.61–2(d).[4] The dispute between the parties, however, depends on whether Vestal's contention that receipts from the contracts with the El Dorado investors relating to the Olds Gas Field constituted income and a capital asset when received in 1962, although he did not report the value of these contract rights as income on his 1962 return, or whether, as contended by the Government, the contract rights obtained by Vestal in 1962 constituted neither income in 1962 nor a capital asset.

The trial court's finding that the fair market value of Vestal's contract with the El Dorado investors amounted to $29,375 was based on Vestal's own testimony and the opinion of Mr. Leibrock of

Olds, Ltd., who testified as an expert on oil and gas matters. The Government's position is that the rights obtained by Vestal in 1962 by virtue of his contract with the El Dorado investors were contingent, conditional, and speculative, and as a matter of law, did not constitute income taxable to Vestal in 1962.

The Treasury Regulations on Income Tax define gross income as including "income realized in any form, whether in money, property, or services," Treas. Reg. § 1.61–1(a), and, as we have already noted, Treas.Reg. § 1.61–2(d) provides that where services are paid for with something other than money, the "fair market value" of the property or services taken in payment must be included in income. The term "fair market value" as used by this circuit in conjunction with the tax statutes has been broadly defined as the established market value of property, the sum resulting from fair negotiations between buyer and seller, Whitlow v. Commissioner of Internal Revenue, 82 F.2d 569, 572 (8th Cir. 1936), or the fair or reasonable value of the property, North American Telegraph Co. v. Northern Pac. Ry., 254 F. 417, 418 (8th Cir. 1918).

■■ Where a contract calls for future payments of compensation based on unmet conditions, contingencies, or speculation, the courts have been loath to assess any present tax consequences to the transaction and thus to require the beneficiary of the contract to pay an income tax upon a potential, as distinguished from a guaranteed receipt of those funds. Deshotels v. United States, 450 F.2d 961 (5th Cir. 1971), cert. denied, 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed.2d 119 (1972); Mills v. Commissioner of Internal Revenue, 399 F.2d 744 (4th Cir. 1968); Pounds v. United States, 372 F. 2d 342 (5th Cir. 1967); Edelman v. United States, 329 F.2d 950, 165 Ct.Cl.

---

4. Treas.Reg. § 1.61–2(d) in part reads:

(d) *Compensation paid other than in cash*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in in-

come. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary.

91 (1964); *cf.* Victorson v. Commissioner of Internal Revenue, 326 F.2d 264 (2d Cir. 1964). Additionally, in executory contracts for future compensation payable in kind, such as in this case, compensation is not deemed to be paid until the taxpayer actually or constructively receives the property. Pounds v. United States, *supra*; United States v. Frazell, 335 F.2d 487 (5th Cir. 1964), cert. denied, 380 U.S. 961, 85 S.Ct. 1104, 14 L. Ed.2d 152 (1965); Smith's Estate v. Commissioner of Internal Revenue, 313 F.2d 724 (8th Cir. 1963); Massey v. Commissioner of Internal Revenue, 143 F.2d 429 (5th Cir. 1944).

Bearing these principles in mind, we turn to the undisputed facts in the record.

1) The contracts between taxpayer Vestal and the El Dorado investors called for payments in the future.

2) The contracts called for contingent payments, *i. e.,* to be delivered after the El Dorado investors had recovered their investment in the Olds, Ltd. partnership, plus interest.

3) The distribution of the payment in kind (a conveyance of a one-eighth interest in the Olds Field held by each El Dorado investor) was conditional, *i. e.,* dependent on obtaining consent of the general partners of Olds, Ltd.[5]

4) The value of the interest in kind to be delivered in the future rested in part on speculative factors. In 1962 no additional steps had been taken toward the development of the Olds Gas Field, except for the raising of additional capital and the commencement of drilling of additional wells as required by the terms of the lease purchased from Shell Oil Company. The construction of facilities to change "sour" gas to "sweet" gas, the obtaining of a customer to purchase the gas, the obtaining of a market for by-products produced in the gas production; in short, all the steps needed to convert and sell the gas, remained as subjects for future action. Although plaintiff submitted proof that the gas field leased by Olds, Ltd. contained proven reserves, no rate of return was or could be established in 1962 for any investor, although the overall return to the limited partners over 25 years was said to be 16 million dollars.

5) No established market was shown for any limited partnership interests in Olds, Ltd. None had been transferred. The witnesses in giving their opinions on "fair market value" calculated Vestal's contract rights as worth "at least" one-eighth of the total subscription of the El Dorado investors, one-eighth of $235,000, or $29,375.

We must recognize that Vestal's contract rights to later obtain a possible interest in the Olds Field had value, but such recognition does not support a view that Vestal received income under the federal tax laws. In an early case involving an agreement for annual payments based on iron ore tonnage to be extracted in the future, the Supreme Court determined that the taxpayers did not become obligated to pay an income tax based on the present value of the contract right, observing:

The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions and speculation. When the profit, if any, is actually realized, the taxpayer will be required to respond. [Burnet v. Logan, 283 U.S. 404, 412–413, 51 S. Ct. 550, 552, 75 L.Ed. 1143 (1931).]

Two recent Fifth Circuit cases are instructive. In United States v. Frazell, 335 F.2d 487 (5th Cir. 1964), cert. denied, 380 U.S. 961, 85 S.Ct. 1104, 14 L. Ed.2d 152 (1965), taxpayer-geologist promoted investments in oil-bearing properties and obtained a contract from investors for services rendered. The

---

5. According to testimony, the general partners would surely have consented to Vestal's obtaining an interest in the venture as a limited partner by a transfer from the El Dorado investors.

contract, which was executed in 1951, stipulated among other things that he was to receive an interest in the oil properties, but was not to be considered as owning any interest, until the investors "shall have recovered their full costs and expenses * * *." In 1955, taxpayer received a vested interest through issuance of stock in a corporation organized for the purpose of holding the oil properties. Taxpayer claimed entitlement to a tax-free exchange under § 351(a) I.R.C. of 1954, on the theory that he had initially received an interest in the oil and gas field in 1951, and had participated in a tax-free exchange in 1955. Under the statute a payment received for services cannot qualify as tax-free exchange. The court rejected the taxpayer's claim, stating:

> The contract made it clear that Frazell [taxpayer] would "not have the right to dispose of any rights which may accrue to him" before those costs were recovered. 213 F.Supp. at 472. But after November, he would have received a largely unrestricted interest in about 13% of the partnership properties. That this interest was primarily, if not entirely, in return for Frazell's services to the enterprise is undisputed. Thus, so much of the interest Frazell was to receive in November 1955 as could be attributed to his services for the oil venture would have been ordinary income to him in the year of receipt.
>
> The applicable rule is in no way changed by Frazell's contention that his interest in the enterprise was a "carried interest." * * * Even if Frazell is taken to have had some sort of interest in the properties in question from their first acquisition, his interest would not have become possessory until November 1955. Under Treasury Regulation § 1.721–1(b)(1), the value of that interest would have been taxable to him at that time. [335 F.2d at 489–490 (footnote omitted).]

Pounds v. United States, 372 F.2d 342 (5th Cir. 1967), also holds contrary to taxpayer's contentions. There the taxpayer was a real estate broker who, for services rendered, obtained a contract in 1954 from the owner of a tract of land for a share of the profits that might be realized on the land—12½ percent for taxpayer's brokerage service and a further 12½ percent share attributable to a second broker's service which taxpayer acquired by purchase for $2,500. The owner's contract with taxpayer contained this provision:

> It is further agreed that at such time as this property is sold and the total investment has been recovered, including taxes and other expenses which may develop in the interim from its purchase date to the date of sale, such excess as develops to be net profit which shall (sic.) divided, first 25% of the actual net profits shall be remitted as appreciation and remuneration for your efforts in working out all of the details necessary in the consummation of this deal. [372 F.2d at 344.]

The real estate produced a profit in 1959, and in that year taxpayer received his 25 percent share ($14,481.41). He sought capital gains treatment using as a basis $5,000 as the 1954 value of the property. The court held the 12½ percent interest in profits in place of the usual agent's commission constituted ordinary income as compensation for services rendered under I.R.C. § 61(a). The court further held the taxpayer's contract right to share in future profits, although "property" in the broad sense, could not be deemed as a capital asset under the circumstances. See also Vaaler v. United States, 454 F.2d 1120, 1122 (8th Cir. 1972). The Pounds court stated:

> But where the taxpayer has only a right to share in the profits that might be realized, that interest cannot be treated as a capital asset. The definition of a capital asset must be narrowly applied and its exclusions interpreted broadly in order to effectuate the congressional purpose underlying the capital gains provision. Capital

gains treatment was intended to relieve the taxpayer from the excessive tax burden on gain resulting from a conversion of capital investment. [372 F.2d at 346.]

The court concluded:

We give weight to the fact that Pounds had no legal or equitable interest in the land; he had only a contingent right to share in future profits, if any, in return for personal services rendered. In these circumstances we must classify his 12½ per cent share of the profits as ordinary income under Section 61(a). In any event the payment Pounds received would be ordinary income since there was no "sale or exchange" as required by Section 1222. [*Id.* at 348.] [6]

The foregoing cases hold contrary to Vestal's contentions. The testimony offered at the trial by Vestal and Mr. Leibrock, his expert witness, that in their opinion Vestal's contract rights in 1962 were worth at least $29,375, cannot establish a fair market value for the property in the face of the documentary evidence existing in 1962, which consisted of the written plan for development of the Olds Gas Field, the partnership agreement establishing Olds, Ltd. and Vestal's agreement with the El Dorado investors. These documents undisputably show that the amount of or value of Vestal's ultimate compensation rested upon speculative factors. To permit opinion evidence to establish a value for the property some years later would permit the taxpayer to vary at will the taxable incidents of the 1962 transaction without incurring any consequences for a change of mind. [7]

Vestal did not pay any tax in 1962 based on the receipt of income attributable to his contract rights obtained from the El Dorado investors that year. Vestal candidly testified:

A No, sir, I did not, because I keep books on a cash basis, it never occurred to me to report anything until I had actually received the money for it.

Q All right. Is that the only reason you didn't report it?

A Yes, sir.

Yet taxpayer several years later seeks a new tax arrangement. He now asserts that he received $29,375 in additional income to that reported in 1962. If that is the case, he would not now pay any tax on that unreported income because of the running of the statute of limitations. 26 U.S.C. § 6501. Yet lf the Government at any time prior to the liquidation of Olds, Ltd. sought to assess additional income taxes against Vestal for income received in 1962, Vestal could have mounted persuasive arguments showing that his contract called only for future compensations.

In addition, a very serious valuation problem would have arisen in attempting to value the contract rights in 1962. Undervaluation would allow compensatory income taxable at ordinary rates to be treated as capital appreciation upon taxpayer's actually receiving the performance promised him by the contract. *See* Pounds v. United States, *supra*. When dealing with a situation such as the present where taxpayer holds an executory contingent contract payable in the future, the tax laws should not be construed so stringently, on the one hand, so as to require a taxpayer to pay an income tax on its estimated value; nor should they be construed so loosely, on the other, as to permit him to establish a basis for those same contract rights in the absence of a showing that

---

6. The court stated that no problem existed with regard to the 12½ percent interest which taxpayer purchased from the other participating real estate broker as the basis of the property became fixed by the payment of the purchase price. Pounds v. United States, 372 F.2d 342, 348 (5th Cir. 1967).

7. *Cf.* Deshotels v. United States, 450 F.2d 961, 966–967 (5th Cir. 1971), cert. denied, 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed.2d 119 (1972), holding that testimony does not prevail over written terms of the contract in fixing the tax consequences flowing from taxpayer's agreement.

there was an actual trading or marketing of those rights. In this respect, taxpayer cannot at the same time "have his cake and eat it, too."

Appellee would distinguish the preceding cases cited by the Government by relying on Dorman v. United States, 296 F.2d 27 (9th Cir. 1961). There taxpayer received a contract from a landowner to become a partner in a ranching operation in return for his managing the ranch. The taxpayer would obtain a "fully paid vested interest" upon repaying the sum of $300,000 lent to taxpayer by his co-partner to acquire the partnership property. More than six months later the ranch was sold and taxpayer received $12,470 for his share after payment of all his obligations to his co-partner. The taxpayer sought to account for the receipt of these funds on a long term capital gains basis. The trial court denied taxpayer relief but on appeal the Ninth Circuit reversed, holding that the trial court erred in characterizing the payment as salary or severance pay. The court ruled that taxpayer, in obtaining a right to acquire a partnership interest in the future, received a capital asset which he relinquished for the sum of $12,470. "The relinquishment of these rights," according to the court, "constitute[d] the sale of a capital asset and the gain upon the sale constitutes [a] capital gain." 296 F.2d at 32 (citation omitted).

*Dorman* is itself distinguishable, however, because neither the parties nor the court attempted to place any initial value on the contract right obtained by the taxpayer. Moreover, the Ninth Circuit carefully noted that different tax consequences would follow if the questioned payment were deemed compensation payable in the future. Such payment would qualify as ordinary income when received.

■ We hold that in 1962 Vestal received neither income nor acquired any "basis" for any contract rights obtained from the El Dorado investors. His receipt of monies in 1964, as the equivalent of a one-eighth share of the rights of the El Dorado investors in the limited partnership, constituted a payment for his services under the contracts with the El Dorado investors. Thus, when received these amounts were reportable and taxable as ordinary income.

## II.

### DANIEL'S CLAIM

Daniel reported a long term capital distribution from Olds, Ltd. of $187,149.62 on his 1965 individual income tax return. In that same year he distributed $25,422.54 to Vestal under the terms of the El Dorado investors agreement whereby Vestal was to receive a one-eighth interest in Olds, Ltd. after the recovery by Daniel and the other El Dorado investors of their investments plus compounded interest. As we have already noted, Daniel claimed this distribution as a deductible expense from ordinary income under 26 U.S.C. § 212,[8] not a capital expenditure incurred in the acquisition of an asset. We reject this claim.

In describing the transaction, Daniels testified:

Q Would you, in your own words, explain that first contact?

A Well, it was about 10:30 one night and Jack called me and I had already gone to bed, and he told me he had a deal he thought I would be interested in. I told him Thase [Daniel's wife] and I had planned to go to Little Rock the next day and I'd see him the day following, and he said, "Well," said [sic.] "this is a pretty important deal and," he said, "unless there is

8. Section 212 in part reads:

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income[.]

something unusual about a trip to Little Rock I think you should see me tomorrow". So I asked Thase about putting the trip off, and she said okay we would put it off. So the next day he came and submitted the proposition to me, and I bought it.

On cross-examination he further explained:

Q In other words, he gave you information about the investment, he consulted with you and advised you on whether or not to make the investment?

A Yes, sir.

Q And then in return you made the investment and were to give him an interest for bringing it to you?

A Yes, sir.

Here, the impetus for the investment came from Vestal who undertook to raise the balance of about $250,000 needed for additional capital by Olds, Ltd. Vestal thought the investment attractive and undertook to sell the proposal to Daniel and others. This transaction between Vestal and Daniel was isolated and spontaneous. Daniel offered no evidence that he had requested Vestal to find him oil investments or that he had retained Vestal to provide him with advice as a consultant.

■ The payments made by Daniel was the price which Vestal exacted in return for bringing to Daniel this investment opportunity. Thus, the payments made by Daniel to Vestal to obtain the investment must be characterized as a commission or finder's fee and must be deemed "costs incurred in the acquisition or disposition of a capital asset * * * to be treated as capital expenditures." Woodward v. Commis-

sioner of Internal Revenue, 397 U.S. 572, 575, 90 S.Ct. 1302, 1305, 25 L.Ed.2d 577 (1970), affirming 410 F.2d 313 (8th Cir. 1969). See Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938); Helgerson v. United States, 426 F.2d 1293 (8th Cir. 1970). Accordingly, these amounts are not deductible as ordinary and necessary expenses but instead must be added to Daniel's basis in his partnership interest as a capital expenditure incurred in the acquisition of an asset.

The tax court decision of Edward Mallinckrodt, Jr., 2 T.C. 1128 (1943),[9] relied on by appellee and the district court, is distinguishable on its facts and does not support the Daniel deduction. In Mallinckrodt, an investor-taxpayer and an investment consultant had engaged in an ongoing and continuous relationship over several years. The taxpayer, who derived his income from large investments in stocks and bonds, claimed a business expense deduction for amounts expended in obtaining advice from the investment consultants "as to what investments under the then existing conditions ought to be disposed of, what ought to be purchased in their stead, and what investments might be safely and profitably retained." 2 T.C. at 1146–1147. While the tax court found for Mallinckrodt, we think that his arrangement sharply contrasts with the single-investment arrangement between Vestal and Daniel.

We reverse and direct that the suits for tax refunds be dismissed.

Reversed.

## ORDER ON PETITION FOR REHEARING

On petition for rehearing and suggestion for rehearing en banc taxpayers-

9. The tax court opinion was affirmed by this court in Mallinckrodt v. Nunan, 146 F.2d 1 (8th Cir.), cert. denied, 324 U.S. 871, 65 S. Ct. 1017, 89 L.Ed. 1426 (1945), but we did not discuss or pass on the business expense deduction issue which is presently relevant to Daniel's claim.

Vestals contend our decision conflicts with Diamond v. Commissioner, 492 F.2d 286 (7th Cir. 1974), affirming 56 T.C. 530 (1971). Although *Diamond* was not cited to us previously, we do not find that decision inconsistent with our holding in *Vestal.*

In *Diamond*, the taxpayer was a mortgage broker who, along with a third party who held a contract to purchase an office building, agreed in 1961 to purchase and operate the building as a joint venture. They consummated the purchase in February, 1962, and shortly thereafter Diamond sold his interest for $40,000, and sought to account for these proceeds as a short term capital gain on his 1962 income tax return. The Seventh Circuit, in agreement with the Tax Court, rejected the plaintiff's contention and held the sum to be ordinary income. The Seventh Circuit also stated that even if capital gain treatment were appropriate, no gain had occurred for, as the Tax Court determined, the value of Diamond's partnership interest as received on February 18, 1962, and as sold a few weeks later, amounted to $40,000.

Aside from certain aspects of partnership tax law, not present in the *Vestal* case, the determination that Diamond received ordinary income in the tax year of 1962 and the court's statement that "the receipt of a profit-share with determinable market value is income," 492 F.2d at 291, is consistent with our holding in *Vestal.* In *Diamond*, the taxable event occurred in 1962, when the parties actually acquired the building to be held as a joint venture, not in the prior year when the preliminary contract was made. Similarly, in *Vestal*, we hold that the taxable event occurred upon acquisition of the actual joint venture interest by Vestal, not in an earlier year upon execution of the initial contract between Vestal and the El Dorado investors.

Accordingly, the petition for rehearing is denied.