JOSEPH E. LAGREW and LOIS LAGREW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lagrew v. Commissioner
Docket No. 540-73.
United States Tax Court
T.C. Memo 1976-310; 1976 Tax Ct. Memo LEXIS 92; 35 T.C.M. (CCH) 1389; T.C.M. (RIA) 760310; September 30, 1976, Filed Barry Benton, for the petitioners. Philip G. Owens, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1968 in the amount of $104,566.16. The issue for decision is whether Joseph E. Lagrew realized ordinary income in 1968 by reason of receiving 41 shares of stock in Gribbin Enterprises, Inc. and, if so, the amount of such income realized. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband *93 and wife, who resided in Lexington, Kentucky at the time of the filing of their petition in this case filed a joint Federal income tax return for the calendar year 1968 with the District Director of Internal Revenue, Louisville, Kentucky. Petitioners kept their records and prepared their income tax return on the cash basis of accounting. Joseph E. Lagrew (hereinafter referred to as petitioner) had been acquainted with Mr. and Mrs. Eugene L. Gribbin since his early childhood. When petitioner returned to Lexington, Kentucky, after having been away attending college and serving in the armed forces, he became socially friendly with Mr. and Mrs. Gribbin. Petitioner and his wife visited with the Gribbins from time to time. Mr. and Mrs. Gribbin at the time lived on a 43.07 acre farm located on Richmond Road near Lexington, Kentucky which they had acquired in 1944. Initially the Gribbins had operated a gift shop and antique business in a building on the farm property. However, prior to 1967 Richmond Road in front of the farm property was widened and the building became unsuitable for the Gribbins' business operation. At that time the Gribbins moved their business location into the *94 City of Lexington, but continued to reside on the farm. The farm, in 1967, was zoned for agricultural use. However, the city limits of the City of Lexington had been extended so that by 1967 the farm was in close proximity to the city. Hearings had been held before the Lexington-Fayette County Zoning Commission with respect to future development of land areas which encompassed the general area in which the Gribbin farm was located. Prior to October 5, 1967, petitioner had discussed with the Gribbins the possibility of obtaining a zoning change for the Gribbin property so that the property could either be developed, sold or leased for a better use than farm property. After such discussions, and with the consent of the Gribbins, petitioner had approached Julian W. Knippenberg, a member of the law firm of Carroll and Knippenberg, with respect to the possibility of obtaining a zoning change for the Gribbin property. Mr. Knippenberg had at one time been the chairman of the Lexington-Fayette County Zoning Commission and did a substantial legal practice in connection with obtaining changes in the zoning of property. Following petitioner's contact with Mr. Knippenberg, the Gribbins, *95 petitioner, Mr. Knippenberg, and James S. Carroll, Mr. Knippenberg's law partner, entered into an agreement dated October 5, 1967. This agreement provided, in pertinent part, as follows: THIS AGREEMENT, made and entered into this 5th day of October, 1967, by and between BEATRICE L. GRIBBIN and EUGENE L. GRIBBIN, her husband, parties of the first part, JOSEPH E. LAGREW, party of the second part, and JULIAN W. KNIPPENBERG and JAMES S. CARROLL, parties of the third part. WITNESSETH: WHEREAS, first parties desire to have the hereinafter described real property developed by the most advantageous zoning and to be developed and sold or leased for business and/or industry, and with the understanding that first parties shall approve any and all sales and leases of said property by the hereinafter mentioned corporation. WHEREAS, second party has consented to zone and develop said property according to first parties' desire, without cost to first parties, and WHEREAS, third parties have consented to represent first and third parties and the corporation hereinafter mentioned. NOW THEREFORE, in consideration of the mutual agreement of the parties, it is agreed as follows: 1. Second *96 party shall cause to be filed in the name of the first parties, a petition for a zone change for the hereinafter described property as may be commensurate with the land use plan of the Lexington-Fayette County Zoning Commission. 2. Second party shall organize and form a Kentucky corporation under the name of Gribbin Enterprises, Inc; said corporation shall have 100 shares of non-par stock; and said corporation shall commence business with $1,000.00. 3. The capital shares of the aforementioned corporation shall be divided as follows: (1) Beatrice L. Gribbin and Eugene L. Gribbin, 49 non-assessable shares.
(2) Julian W. Knippenberg and/or James S. Carroll, 10 non-assessable shares. (3) Joseph E. Lagrew, 41 assessable shares. 4. Second party shall assume and pay all necessary expenses, except legal expenses, incurred in the zoning, development of said land and organization of said corporation as herein set forth. 5. The third parties in further consideration of the agreements of the first and second parties and the further consideration of delivery to third parties of ten (10) non-assessable shares of the aforementioned corporation, third parties agree to perform *97 all legal services concerned in the zoning, development and corporate organization without cost to first and third parties or said corporation. 6. The first parties in further consideration of the sum of Forty-Nine Thousand ($49,000.00) Dollars, and the agreements of second and third parties, and the delivery to first parties of forty-nine (49) non-assessable shares of the aforementioned corporation, agree to convey all their right, title and interest in and to the following described property to the aforementioned corporation. This agreement shall be binding on first parties, their heirs and assigns, administrators or executors. It is understood by and between the parties hereto that conveyance to the aforementioned corporation shall be within thirty (30) days after final zoning is complete of the following described property: * * * [the Gribbin farm] 7. It is contemplated by and between the parties hereto that the aforementioned corporation shall operate as a Chapter "S" Corporation for tax purposes. 8. It is agreed by and between second and third parties that the sum of Forty-Nine Thousand ($49,000.00) Dollars to be paid to first parties upon conveyance of this *98 property as set forth in Paragraph 6 hereof, shall be as follows: (1) The party of the second part shall pay to the parties of the first part the sum of $44,100.00. (2) The parties of the third part shall pay to the parties of the first part the sum of $4,900.00. * * *
On November 24, 1967, pursuant to the terms of the October 5, 1967, contract, James S. Carroll, Julian W. Knippenberg, and petitioner filed an application for a zoning change regarding the Gribbin farm. Mr. Knippenberg was aware that the Lexington-Fayette County Zoning Commission would not look favorably upon rezoning one area of property without including surrounding property in the same zoning ordinance. Mr. Knippenberg had informed petitioner of the necessity of including surrounding land owners in the request for rezoning of the property. Petitioner, after consulting with Mr. and Mrs. Gribbin, requested Mr. Knippenberg to contact the individuals. Mr. Knippenberg and petitioner also discussed the fact that with the participation of other landowners part of the costs of prosecuting the zoning application would be paid by them, thereby possibly reducing the amount petitioner was obligated under the agreement *99 of October 5, 1967, to pay for the prosecution of the application for change in zoning of the Gribbin property. While this zoning application was pending petitioner discussed with several individuals and with representatives of businesses in the Lexington area the possibility of selling lots from the Gribbin property if rezoning were obtained. Petitioner attended all hearings held before the zoning commission with respect to the rezoning of the Gribbin farm. Petitioner also reimbursed Mr. Knippenberg for costs incurred, other than legal fees, with respect to the rezoning application of the Gribbin property. On April 22, 1968, the Fayette County Fiscal Court disapproved the change with respect to the Gribbin farm on the basis that it would not conform with the land use plan.On May 24, 1968, Mr. Carroll, Mr. Knippenberg, and petitioner caused an application to be filed with the zoning board for a zoning change for the Gribbin property together with property owned by four other individuals which adjoined the Gribbin property. The application requested that 20.2 acres of the Gribbin property be changed from zone A-1 (agricultural use) to zone B-3 (highway service business use), *100 and that 22.2 acres be changed from zone A-1 (agricultural use) to zone R-4 (high density apartment use). The application also requested that 13.5 acres of property which was not part of the Gribbin property be changed from zone A-1 to zone B-3.On July 18, 1968, an ordinance was passed changing the zoning for 20.2 acres of the Gribbin property from zone A-1 to zone B-3, and 22.2 acres of the Gribbin property from zone A-1 to zone R-4. On March 5, 1968, Gribbin Enterprises, Inc. had been incorporated under the laws of the Commonwealth of Kentucky. On August 28, 1968, Eugene L. and Beatrice L. Gribbin conveyed the Gribbin property to Gribbin Enterprises, Inc.On that same date at 7 p.m. the first meeting of the shareholders of Gribbin Enterprises, Inc. was held. At this meeting, petitioner moved that stock certificates be issued in accordance with the agreement of October 5, 1967, and the motion was carried. In accordance with this action on August 28, 1968, 49 nonassessable shares of stock of Gribbin Enterprises, Inc. were issued to Mr. and Mrs. Gribbin, 10 nonassessable shares of stock of Gribbin Enterprises, Inc. were issued to Mr. Carroll and Mr. Knippenberg, and 41 assessable *101 shares of stock of Gribbin Enterprises, Inc. were issued to petitioner. Petitioner paid to Mr. and Mrs. Gribbin the $44,100 which the contract provided be paid to them by petitioner upon conveyance of the Gribbin property to Gribbin Enterprises, Inc., and Mr. Carroll and Mr. Knippenberg paid the Gribbins the $4,900 which the contract provided they would pay to the Gribbins upon the conveyance of the Gribbin property to the corporation. Petitioner owned a house in Lexington, Kentucky which he decided to sell in order to obtain the funds to pay to Mr. and Mrs. Gribbin as required by the agreement of October 5, 1967. His house was purchased in late July or early August 1968 by a Mrs. Betty J. Day. Mrs. Day was at the time and is a development consultant, a mortgage loan broker, and the owner of a general insurance agency. Prior to taking possession of petitioner's home, Mrs. Day had come to the house on several occasions to examine it, with plans toward remodeling before she moved into the house. While there, she saw a plat on petitioner's dining room table and petitioner told her that this was a plat of the Gribbin property in which he owned an interest. Mrs. Day discussed with *102 petitioner persons she thought might be interested in buying certain portions of the property and how long it might take to develop the property. Mrs. Day, in 1968, served as a development consultant in the Lexington area to a corporation, Unit, Inc., which was engaged in the purchase and development of properties in various locations throughout the county. In the latter part of 1968, Mrs. Day was attempting to interest Unit, Inc. in acquiring property for development in the Lexington area. She dealt primarily with the vice president of Unit, Inc., W. W. Robinson, who was responsible for purchases for the corporation. However, Mr. Robinson and Mrs. Day also consulted with Mr. B. W. Morris, who in 1968 and 1969 was president of Unit, Inc., concerning the purchase of property in the Lexington area. Mrs. Day examined with Mr. Robinson a number of properties in the Lexington area which would be suitable for development by Unit, Inc. The development contemplated was high rise apartments and possibly some business establishments. Among the properties which Mrs. Day showed to Mr. Robinson was the Gribbin property. Unit, Inc. had an engineering study for sewer connections and layout *103 for the Gribbin property made. Unit, Inc. also obtained information as to the amount of mortgage loans that could be obtained on the Gribbin property. On November 29, 1968, Unit, Inc. made an offer to Gribbin Enterprises, Inc. to purchase the 43.07 acres of Gribbin property for the amount of $705,000. On December 6, 1968, through a letter from the law firm of Carroll and Knippenberg, a counter-offer was made on behalf of the stockholders of Gribbin Enterprises, Inc. that they sell to Unit, Inc. all their stock in that corporation for a total price of $705,000. Several drafts of proposals with respect to this sale were made and exchanged between representatives of Gribbin Enterprises, Inc. and representatives of Unit, Inc. On December 26, 1968, B & B Properties, Inc. (hereinafter B & B) was incorporated under the laws of the Commonwealth of Kentucky as a subsidiary of Unit, Inc. On February 12, 1969, petitioner, the Gribbins, and Messrs. Carroll and Knippenberg, as sellers, entered into a contract with B & B, as buyer, for the sale of all of the stock of Gribbin Enterprises, Inc. to B & B for the sum of $705,000. On April 15, 1969, in accordance with the terms of this contract *104 the Gribbins, petitioner, and Messrs. Carroll and Knippenberg sold all of their stock in Gribbin Enterprises, Inc. to B & B for the sum of $705,000. The terms of the sale were for payment of the stock over a period of 7 years, the note given for the unpaid portion of the purchase price to bear interest at the rate of 6-1/2 percent. In accordance with the terms of the sales agreement, petitioner was to receive $289,050 for his 41 shares of stock of Gribbin Enterprises, Inc. The parties all agreed that the first payments would be made to the Gribbins until their stock had been paid for in full. The next payments were to be made to Messrs. Carroll and Knippenberg, and finally petitioner was to receive payment for his stock. At the time of the trial petitioner had received payment in full for his 41 shares of stock of Gribbin Enterprises, Inc. Mrs. Day received payment from Unit, Inc. for the services she rendered in locating property for B & B, but received no payment from Gribbin Enterprises, Inc. or any of the stockholders of Gribbin Enterprises, Inc. Prior to entering into the agreement of October 5, 1967, Mr. Gribbin had had discussions with a prospective purchaser of the *105 Gribbin property on the basis of selling the property for $300 a front foot. The front footage of the property was between 1,100 and 1,200 feet. Mr. Gribbin, based on these discussions, was of the opinion that without rezoning his property was worth approximately $350,000. He considered that with rezoning of the property and the formation of the corporation he should obtain in total, including the $49,000 he received upon transfer of the property to the corporation, something over $350,000 for the property. It was with this thought in mind that he required the provision in the contract of October 5, 1967, that he and Mrs. Gribbin should approve any and all sales and leases of the property by Gribbin Enterprises, Inc. Property values in the Lexington, Kentucky area were rising at a rapid rate from about 1966 through 1969 or early 1970. There was much activity during late 1968 and early 1969 in the real estate market with respect to purchases of properties for apartment and commercial development. Properties zoned commercial in the general vicinity of the Gribbin property sold on an acreage basis at a substantially higher price than properties zoned for residential apartments. *106 The following sales of property were made in the general area of the Gribbin property on the dates and at the prices per acre or total prices indicated: 1. In 1969, a 40-acre tract of land, in the close proximity of the Gribbin property, which was zoned B-1 (business) sold for $20,000 per acre. This property, which is now known as Lexington Mall, fronts on both Richmond Road and New Circle Road.
2. In September 1968, pursuant to a contract entered into in 1965, a 117-acre tract on Nichols Road at Reynolds Road in the general vicinity of the Gribbin property sold for approximately $5,700 per acre. This property was zoned partially as A-1 (agricultural use), partially as R-4 (high density apartment use), and partially as B-3 (highway service business use). 3. On June 6, 1968, a 42-acre tract off of New Circle Road zoned R-4 (high density apartment use) sold for $3,700 per acre. This property, referred to as the Woods Point property, was zoned only for apartments and because of its location it would have been difficult to have any zoning change made with respect to the property. The property did not adjoin Richmond Road and access to the property was poor.It was surrounded by *107 existing developments of inexpensive town houses and Government-subsidized housing. Across New Circle Road were business establishments that would not be under the control of the developer of the Woods Point property. 4. In 1965, a 70-acre tract at the corner of Russell Trade Road and New Circle Road sold for $900,000 or approximately $12,850 per acre. The tract which fronted on New Circle Road and Russell Trade Road was zoned for light industry. 5. In 1964, the Lexington Board of Education purchased a 50-acre tract fairly close to the Gribbin property at $6,000 per acre. 6. In December 1965, approximately 32 acres of property located at the corner of Harrisburg and Lane Allen Road sold for $600,000 or a little over $19,000 per acre.This property was zoned for commercial development and is closer to the center of the City of Lexington than the Gribbin property. 7. In 1966, approximately 22 acres of land on Richmond Road but nearer to downtown Lexington than the Gribbin property sold for $296,500 or a little over $13,500 per acre. This property at the time of the trial of this case was developed into an area known as the Jamestown Apartments. A minority stock interest *108 in a corporation which owns land would generally sell at a discount from its percentage of the value of the land owned by the corporation. Petitioners, on their 1968 income tax return, did not include any reference to the 41 shares of stock that petitioner, Joseph E. Lagrew, received on August 28, 1968, from Gribbin Enterprises, Inc. On their 1969 return they reported the sale of the 41 shares of stock as the sale of a capital asset on an installment basis with no gain realized in the year 1969 because of no payment being received in that year. Respondent, in his notice of deficiency to petitioners, increased their 1968 income as reported by $244,950 with the following explanation: It is held that you received taxable income of $244,950.00 during 1968 upon the acquisition of 41 per cent of the stock in Gribbin Enterprises, Inc. on August 24, 1968. The fair market value was determined to be 41 per cent of $705,000.00, or $289,050.00, whereas amount paid was $44,100.00. The difference of $244,950.00 is determined to represent compensation for services and, therefore, includable in income under Section 61 of the Internal Revenue Code. On brief, respondent *109 contends that petitioner received ordinary income in 1968 when he acquired the 41 shares of stock in Gribbin Enterprises, Inc. of at least $202,515. OPINION Respondent's position in this case is that the stock received by petitioner on August 28, 1968, to the extent that its fair market value exceeded the amount petitioner paid for the stock, was property transferred to petitioner as compensation for service within the meaning of section 61, I.R.C. 1954, and sections 1.61-2(d)(2)(i) and (4), Income Tax Regs.[1]
*110 Petitioner's position is that the stock was not received for services rendered either to Mr. and Mrs. Gribbin or to Gribbin Enterprises, Inc.He contends that he rendered no services to either the Gribbins or the corporation in return for the right to purchase the stock. Petitioner argues that if the stock had a value when he received it on August 28, 1968, in excess of the amount he paid for the stock, he merely made a bargain purchase of the stock. In the alternative petitioner contends that if the stock had a value when he received it in excess of the amount he paid for the stock and the stock was not a bargain purchase, the excess value was a gift to him from Mr. and Mrs. Gribbin. It is well settled that compensation for services is taxable as ordinary income whether the compensation is received by way of salary, fees, commission, receipt of property, or the right to purchase property. Commissioner v. LoBue,351 U.S. 243 (1956); United States v. Frazell,335 F. 2d 487, 489 (5th Cir. 1964); Glenn E. Edgar,56 T.C. 717, 746-747 (1971). *111 Ordinarily a purchase of property does not result in the realization of income. However, when stock is sold to a taxpayer at a bargain price for the purpose of compensating him for services, that taxpayer receives income to the extent of the excess of the fair market value of the stock over its cost to him. William H. Husted,47 T.C. 664, 673 (1967), and cases there cited. In our view, the record here is clear that the stock petitioner was to receive under the contract of October 5, 1967, to the extent its value exceeded the $44,100 he agreed to pay for the stock, was compensation to petitioner for services rendered. [2] The record here shows that prior to the time the contract of October 5, 1967, was entered into petitioner had discussed with Mr. and Mrs. Gribbin the rezoning of their farm property and transfer of their property to a corporation. In accordance with these discussions and with the understanding that an agreement would be entered into, petitioner had arranged for the services of Messrs. Knippenberg and Carroll in the rezoning of the property. The services *112 of these lawyers were to be rendered for an interest in the corporation which was to own the property after the rezoning was completed. The contract of October 5, 1967, was the written agreement setting forth the understanding which had been reached by the parties. In effect, by arranging to have Messrs. Knippenberg and Carroll render the legal services necessary to rezone the Gribbin property, petitioner rendered certain services to the Gribbins. However, the contract provided for other services to be rendered by petitioner. The contract required petitioner to attempt to rezone and develop the property in accordance with the Gribbins' desires, to cause to be filed in the Gribbins' name a petition for zone change of the property, and to organize *113 and form a Kentucky corporation to which the property would be transferred. The record here shows that petitioner, with the assistance of Messrs. Knippenberg and Carroll, did in fact cause a petition for a zone change in the Gribbin property to be filed with the Lexington-Fayette County Zoning Commission and that he did, with the assistance of these attorneys, form a Kentucky corporation under the name of Gribbin Enterprises, Inc. to which the Gribbin property was later transferred. The record also shows that petitioner discussed the zoning problems with Mr. and Mrs. Gribbin and discussed with the lawyers the joining of other surrounding property holders in the petition. Although the lawyers actually contacted the surrounding property holders, it was after consultation with petitioner that this was done. In fact, this record shows that petitioner performed the services in connection with the rezoning of the Gribbin property that ordinarily the owner of the property would have performed.
In our view, although the agreement of October 5, 1967, does not specifically state with respect to petitioner that he agrees to perform his services in return for the 41 shares of stock, as it does *114 with respect to the legal services to be rendered by the lawyers in return for 10 shares of stock to be issued to them, the import of the contract is clear that petitioner's receipt of his 41 shares of stock was in return for the services he was to perform under the contract as well as for the $44,100 he was to pay for the stock. [3] The Gribbins agreed to transfer the land to the corporation 30 days after final zoning was completed in consideration of $49,000 "and the agreements of second and third parties" and the delivery to them of 49 shares of stock of Gribbin Enterprises, Inc. The value in the corporation was obviously to come from the land which the Gribbins conveyed to the corporation, since this was to be, and actually was, the only asset of the corporation. The agreement of petitioner (second party to the October 5, 1967, contract) to obtain rezoning of the property and to organize the corporation and to assume and pay the necessary expenses for rezoning had been performed on August 28, 1968, when the land was transferred by the Gribbins to Gribbin Enterprises, Inc. *115 Petitioner takes the position that even though things he did in connection with the formation of the corporation and the rezoning of the land might be considered services, his receipt of stock was not in payment for such services. He argues that it was contemplated that the value of the land at the time it would be transferred to the corporation would not exceed $98,000 so that his pro rata payment for stock would have been in full payment for his share of the land. If the record did show that on October 5, 1967, all parties to the contract contemplated that the value of the land after it was rezoned would be only $98,000, it would not necessarily follow, as petitioner contends, that he should be considered to have made a bargain purchase of land and not received stock in compensation for services. See Edelman v. United States,329 F. 2d 950 (Ct. Cls. 1964). However, this record does not support petitioner's contention that the parties on October 5, 1967, contemplated that after rezoning the Gribbin property, transferred to the corporation, would have a value of only $98,000. The testimony of Mr. Gribbin is clear that in his opinion prior to the execution *116 of the contract of October 5, 1967, the land had a value of somewhere around $350,000. Whether this was in fact the value of the land at that time is not important. Since Mr. Gribbin did consider prior to entering into the contract of October 5, 1967, that the value of the land without rezoning was three and one-half times $98,000, it is clear that he, as one of the parties, did not contemplate that the land would only be worth $98,000 when it was transferred to the corporation. Petitioner testified that he had initiated a discussion with the Gribbins about having their land rezoned and selling it on the basis that "I would invest the money and they would invest the property" and that "We figured to the best of our ability" that with the property rezoned it would be worth $98,000. He testified that they arrived at the amount from the fact that the property before it was rezoned was assessed by the State of Kentucky at $49,000 under a law that provided for 100 percent assessment and "We just trusted that figure and we figured it was worth $49,000." From the testimony of Mr. Gribbin, it is clear that the $49,000 was not his view of the worth of the property before it was rezoned *117 and that $98,000 was not his view of the value of the property after it was rezoned.These figures were set in the contract purely to determine a cash amount of $49,000 which Mr. and Mrs. Gribbin would receive when the property was transferred to the corporation.Mr. Gribbin anticipated that the balance of the value he considered to be in the property would be received by him when the property was further developed or sold. It is also clear from Mr. Gribbin's testimony that, in his view, the value of the stock petitioner and Messrs. Knippenberg and Carroll were to receive in excess of what they paid for the stock when the land was transferred to the corporation would compensate petitioner and Messrs. Knippenberg and Carroll for the services they rendered in getting the land rezoned and increasing its value over the value it had classed as agricultural land. Mr. Gribbin testified that he put the provision that no sale or disposition could be made of the land without his approval in the contract to make it certain that he would not receive less than he considered the value of the land prior to its rezoning and he had hoped to receive, as he did, more than that amount after the rezoning.
*118 In view of this testimony, the "we" used by petitioner in his testimony could not have included Mr. Gribbin and it obviously was intended to refer to him. Mr. Gribbin's testimony was straightforward. We therefore conclude on the basis of this record that it was not contemplated by the parties to the agreement that the land, when transferred to the corporation, would have no greater value than $98,000. Also, it is unrealistic to conclude that the two lawyers planned to render their legal services without compensation and in fact the contract shows they did not. It is equally clear from this record that the lawyers did not consider that the Gribbin property would have a value of only $98,000 when transferred to the corporation. Petitioner's factual argument for a claimed "bargain purchase" is not supported by the record. There is nothing in the record to support any intent of Mr. and Mrs. Gribbin to make a gift to petitioner of any excess value that his stock would have when received over the price petitioner paid for the stock. Mr. Gribbin specifically testified that in his view this excess value was to compensate petitioner for the various duties undertaken by petitioner *119 in connection with the organization of the corporation and the rezoning of the land and any other services connected with the land which petitioner would perform. On the basis of this record, we conclude that the value of the stock received by petitioner on August 28, 1968, in excess of the $44,100 petitioner paid for that stock was ordinary income to petitioner in compensation for services he rendered in connection with the formation of the corporation and rezoning of the property. [4]
Having determined that the value of the stock received by petitioner on August 28, 1968, in excess of the $44,100 petitioner paid for the stock constitutes ordinary income to petitioner, it is necessary to determine the value *120 of the stock received by petitioner on that date. Both parties recognize that the starting point of valuing the 41 shares of stock petitioner received in Gribbin Enterprises, Inc. on August 28, 1968, is to value the only asset owned by the corporation, the Gribbin property. Petitioner contends that after the value of this property is determined it is necessary to apply a discount to determine the value of his stock since petitioner's interest was a minority one and the Gribbins had complete control under the contract of October 5, 1967, over the use and disposition of the property. Respondent recognizes that ordinarily some discount for a minority interest of stock in a corporation would be required, but argues that such a discount is not required here because of the close personal relationship between petitioner and Mr. and Mrs. Gribbin. Petitioner offered the testimony of a number of individuals with respect to the value of the Gribbin property on August 28, 1968, and one witness with respect to the value of the stock. Respondent offered the testimony of one witness strictly with respect to the value of the Gribbin property on August 28, 1968, and one witness who testified *121 with respect to the value of the property and the value of the stock. All these witnesses approached valuation by some reference to so-called "comparable" sales. We have set forth in our findings some of the various properties to which these witnesses referred. We have not included in our findings sales of those properties which consisted of such small acreage or were so remote in time from August 28, 1968, as to appear to us to be worthless for any comparative purpose. Even the sales which we have set forth are not sales of property truly comparable to the Gribbin property. The most comparable to the acreage of the Gribbin property which was zoned commercial is the so-called Lexington Mall property which somewhere around 1969 sold for $20,000 per acre. However, the exact date of this sale is not shown in the record and it is clear from the record that commercial or business property sold at a substantially higher price than R-4 residential property, which constituted over 22 acres of the Gribbin property. Some of the sales used by the witnesses as so-called "comparables" had been made in 1964, 1965, and 1966 or the property had been placed under option in one of those years. *122 The record is clear that real estate prices in the area of the Gribbin property were steadily on the rise during this period of time up to about 1970. In fact, one witness used a 3 percent a month increase in value as a percentage. We have considered the testimony of all of the witnesses offered by petitioner with respect to the value of the Gribbin property and conclude that none of them gave proper consideration to the differences in the Gribbin property and the so-called "comparables" they used in arriving at a value of the Gribbin property or to the rise in real estate values between 1965 and 1966 and August 28, 1968. We have therefore found their testimony with respect to value of the property not to be helpful. In fact, several of these witnesses obviously did not view fair market value as what a willing buyer would pay to a willing seller, both being knowledgeable about the property. Their idea was that property values in the area of the Gribbin property based on actual sales that were occurring were inflated and likely to decrease later. Also, none of these witnesses gave any consideration to the fact that three months after August 28, 1968, an offer was made to Gribbin *123 Enterprises, Inc. for purchase of the Gribbin property for $705,000. It developed that instead of accepting this offer the stockholders of Gribbin Enterprises, Inc. countered with an offer to sell all of the stock of Gribbin Enterprises, Inc. for the $705,000. However, the record shows clearly that the purchase of the Gribbin Enterprises stock by B & B was solely in order to obtain the underlying land and that effectively from the standpoint of the purchaser the $705,000 was paid for the land. This offer received so shortly after August 28, 1968, cannot be dismissed in ascertaining the fair market value of the land on August 28, 1968. One of respondent's expert witnesses made a detailed analysis of the sales of so-called "comparable" properties adjusted for differences in those properties and the Gribbin property both as to time and zoning. He gave particular weight to the $705,000 amount which effectively was paid by B & B for the Gribbin property adjusted back for the sturdy increase that was occurring in property values in the area of the Gribbin property at the time. We find his analysis to be the most helpful of any made by an expert witness. Generally speaking, his opinions *124 were substantiated by the underlying data on which they were based and were founded in sound logic. We therefore conclude that the valuation of this witness of the Gribbin property as of August 28, 1968, of $601,500 is the fair market value of the Gribbin property on that date. This valuation witness did not testify as to the value of the stock in Gribbin Enterprises, Inc., but merely to the value of the underlying property. Respondent offered the testimony of another witness to the effect that the value of 41 shares of Gribbin Enterprises stock was 41 percent of the fair market value of the Gribbin property on August 28, 1968. The basis of this witness's testimony was that since petitioner and Mr. and Mrs. Gribbin were very friendly no discount was needed because of the 41 shares not being able to control the corporation. However, fair market value of stock is what a willing purchaser would pay a willing seller, neither being under compulsion and both being reasonably knowledgeable with respect to the stock. It appears reasonable that a purchaser of petitioner's stock would be unlikely *125 to have the same relationship with Mr. and Mrs. Gribbin that petitioner enjoyed. Therefore, even if the stock of petitioner could be valued in his hands in consideration of his relationship with the Gribbins, which of course is doubtful since that relationship might change, certainly a purchaser would not purchase stock relying on a personal relationship with Mr. and Mrs. Gribbin. In our view, it is unrealistic to assume that minority stock in a corporation which owned only one asset, a piece of land, has the same value as its percentage of the land value. The owner of this stock would not be in as favorable position as an owner of an undivided interest in land to force either physical division or sale for division of the property since the property is held by a corporation. Further, under the agreement here any disposition of the land was subject to the approval of Mr. and Mrs. Gribbin even though they owned only 49 percent of the corporate stock. Therefore, the 41 percent stock interest which petitioner owned effectively lacked control over the disposition or use to be made of the corporation's only asset. Certainly these facts would cause an unrelated purchaser to buy the *126 stock only at a reasonable discount. The testimony of the one witness offered by petitioner on the appropriate discount was based on his judgment after considering all the circumstances here present. This expert witness testified that under circumstances such as here present the discount might range from 15 percent to well over 50 percent. He placed the appropriate discount here at 25 percent. This witness was well qualified as a financial analyst and advisor to numerous persons in connection with their financial affairs and acquisition of assets. In our view the best evidence available in this record as to the appropriate discount from the book value of petitioner's 41 percent of stock of Gribbin Enterprises, Inc. on August 28, 1968, to use in determining the fair market value of the stock is the opinion given by this witness of petitioner's. We therefore conclude that the fair market value of petitioner's 41 shares of Gribbin Enterprises, Inc. stock on August 28, 1968, is 41 percent of $601,500, the fair market value of the Gribbin property on that date discounted by 25 percent. We hold that this amount less petitioner's cost of his Gribbin Enterprises, Inc. stock represents *127 ordinary income received by petitioner in 1968 upon receipt of the 41 shares of Gribbin Enterprises, Inc. stock. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, unless otherwise stated. Section 61(a) of the Code, and sections 1.61-2(d)(2)(i) and (4), Income Tax Regs., provide as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * *
Sec. 1.61-2 [Income Tax Regs.] Compensation for services, including fees, commissions, and similar items. * * *
(d) Compensation paid other than in cash--* * * (2) (i) Property transferred to employee or independent contractor. Except as otherwise provided in section 421 and the regulations thereunder (relating to employee stock options) and sec. 1.61-15, if property is transferred by an employer to an employee, or if property is transferred to an independent contractor, as compensation for services for an amount less than its fair market value, then regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the employee or independent contractor. In computing the gain or loss from the subsequent sale of such property, its basis shall be the amount paid for the property increased by the amount of such difference included in gross income. * * *
(4) Stock and notes transferred to employee or independent contractor.Except as otherwise provided by section 421 and the regulations thereunder (relating to employee stock options) and sec. 1.61-15↩, if a corporation transfers its own stock to an employee or independent contractor as compensation for services, the fair market value of the stock at the time of transfer shall be included in the gross income of the employee or independent contractor. * * *
2. In Julian W. Knippenberg,T.C. Memo. 1974-311, 33 TCM 1427↩; P-H Memo. T.C. par.74,311, p.1351 (1974), we held that the two attorneys, Julian W. Knippenberg and James S. Carroll, who were parties to the contract of October 5, 1967, received compensation for services to the extent that the value of the 10 shares of stock they received on August 28, 1968, exceeded the $4,900 they paid for that stock.
3. Under the contract petitioner assumed the obligation to pay all necessary expenses except legal expenses incurred in the zoning and development of the land and the organization of the corporation. The record shows that petitioner did pay such expenses as were incurred in this respect.↩
4. It does appear that the amount of expenses that petitioner paid in connection with the rezoning of the property might properly be a part of his basis in his stock. The record fails to disclose the amount of such expenses paid by petitioner. Also, petitioner has made no contention that those expenses paid by him should increase his basis in the 41 shares of stock. Therefore we find no basis in this record to determine the amount of such additional cost to petitioner.↩