T.C. Memo. 1999-413


UNITED STATES TAX COURT


SHAREWELL, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2909-95.                    Filed December 21, 1999.


Jordan H. Mintz and Morris R. Clark, for petitioner.

Derek B. Matta, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, Judge:  Respondent determined the following deficiencies in petitioner's Federal income taxes and the following accuracy-related penalties:

| Fiscal Year Ended | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| March 31, 1991 | $8,500 | $1,700 |
| March 31, 1992 | 34,000 | 6,800 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue.

We must decide the following issues:

(1) Whether there was a valid covenant not to compete between petitioner and Thomas Wagner, entitling petitioner to amortization deductions for the cost of the covenant.  We hold that there was a valid covenant not to compete and that petitioner is entitled to amortization deductions.

(2) Whether petitioner is liable for the accuracy-related penalties as determined by respondent.  We hold that petitioner is not liable.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts, first supplemental stipulation of facts, and attached exhibits.[1]  At the time of filing the petition, petitioner was incorporated under the laws of Delaware with its principal place of business in Houston, Texas.

---

[1] At trial, respondent withdrew hearsay objections to several of the exhibits attached to the stipulations.

Prior to and during the years in issue, petitioner sold and leased guidance instruments that, when attached to drilling equipment, allow the direction and depth of drilling to be electronically controlled.  Petitioner's customers included companies involved in utilities construction, pipeline river crossing drilling, and oil and gas well drilling.

Petitioner was founded in 1984 by Frank C. Forest (Forest) and Thomas M. Wagner III (Wagner) pursuant to articles of incorporation naming Forest and Wagner as directors.  Forest served as president and Wagner as vice president.  Forest and Wagner each took 40-percent interests in petitioner at incorporation, and they bought out the remaining shareholders in September 1990, after which Forest and Wagner each held 50 percent of petitioner.

Prior to forming petitioner, Forest and Wagner each had extensive experience in drilling technology in the United States and overseas, both in engineering and in marketing such technology to and servicing customers.  The two had previously worked together for more than 15 years at Sperry Sun Well Survey Company (Sperry Sun), a subsidiary of Sun Oil Company, Wagner having started with Sperry Sun in 1960 and Forest in 1966. Forest left Sperry Sun in late 1982 after the company was acquired by N.L. Industries.  Forest's departure was influenced by the fact that he had refused to sign, unless additional

compensation were offered, a covenant not to compete sought by N.L. Industries after it acquired Sperry Sun. After leaving Sperry Sun, Forest formed a company involved with drilling steering tools, which he sold 8 months later. He then took a job with Drill Tech International, which he left to form petitioner in 1984.

Based on their experience together at Sperry Sun, Forest and Wagner each respected the other's abilities. Both saw a niche market for lower-cost surveying and steering equipment that was not available at that time, and the two formed petitioner in May 1984 to develop such equipment and exploit that niche market. Wagner did not leave Sperry Sun until 1985, on an early retirement package.

Petitioner's business was a success. By the late 1980's, petitioner held 80 percent of market share for the products and services it supplied to the utilities construction business and 25 to 30 percent of market share for oil and gas drilling, which was the largest share of any company involved in that field. Various expressions of interest to purchase petitioner were made. One approach, made by Castex, Inc. (Castex), in mid-1990 was considered seriously by Forest and Wagner. They expended considerable time and money responding to Castex's interest, including obtaining financial analyses of petitioner for Castex's review. As part of the purchase negotiations, Castex made clear

that it would require both Forest and Wagner to execute covenants not to compete in connection with the acquisition of petitioner. Preliminary documents prepared for this transaction proposed a noncompete period of 5 years. The contemplated purchase of petitioner by Castex fell through when Castex was unable to secure financing.

By 1990, Wagner had become weary of the rigors of managing petitioner. He was anxious to sell out to Castex in mid-1990 and was disappointed that the deal had fallen through. After the negotiations with Castex ceased, Wagner approached Forest in late 1990 with a proposal that he, Wagner, be bought out. Wagner offered to accept less for his one-half interest than Castex had suggested it would pay, provided the purchase could be completed by yearend. Wagner was anxious to complete the transaction before the end of 1990 because he was aware that capital gains tax rates would increase in 1991. Forest indicated that he wanted to be sure that petitioner could carry the burden of buying out Wagner, and that he would require Wagner to provide a covenant not to compete as part of the buyout to insure petitioner's continued viability. Forest also consulted with petitioner's banker, Lawrence G. Fraser (Fraser), chairman of Texas Capital Bank (Bank), regarding financing for petitioner's purchase of Wagner's interest. Fraser told Forest that the Bank would require a covenant not to compete from Wagner as a

condition for a loan to finance petitioner's purchase of Wagner's shares.  It was a customary practice for the Bank to require a covenant not to compete when it provided financing for the buyout of a partner in an ongoing business.  Wagner indicated that he would agree to sign a covenant not to compete.

Wagner and Forest (on behalf of petitioner) began negotiations in earnest in late November.  The Bank ultimately approved a loan to Sharewell of $1 million to finance the buyout of Wagner.  In connection therewith, Wagner was required by the Bank to agree to purchase a $300,000 participation in the loan. Wagner's participation in the loan was intended to provide the Bank with additional protection or collateral for the loan.  In addition, the Bank required collateral from petitioner in the form of a pledge of petitioner's accounts receivable, inventory and equipment, as well as all stock in Sharewell and a life insurance policy covering Forest.  An internal Bank document, styled a loan worksheet, dated November 28, 1990 (Loan Worksheet), listed the foregoing as security for the loan, as well as Wagner's $300,000 participation.  The Loan Worksheet did not make any reference to a covenant not to compete.

The loan was evidenced by a loan agreement between Sharewell and the Bank executed on December 12, 1990 (Loan Agreement).  The Loan Agreement provided for a loan of $1 million and an

additional line of credit of $400,000.[2]  The Loan Agreement did
not refer to a covenant not to compete or to any participation in
the loan by Wagner.  The Loan Agreement contained a formal
integration clause, as follows:

> This written loan agreement represents the final
> agreement between the parties and may not be
> contradicted by evidence of prior[,] contemporaneous,
> or subsequent oral agreements of the parties.

> There are no unwritten oral agreements between parties.

Although Wagner had initially sought approximately $2
million for the buyout, all in cash, he ultimately agreed to
accept $1 million in cash, the assignment to him of $300,000 of
petitioner's accounts receivable due from Scientific Drilling
International (SDI), and an agreement by petitioner to renew a
$250,000 whole life insurance policy covering him.  Forest and
Wagner handled the negotiations themselves, with some advice from
their accountant.  Forest, in consultation with Wagner and
without professional assistance, drafted a written agreement
(Purchase Agreement) setting out the terms of petitioner's
purchase of Wagner's 50-percent interest.  (The attorney who had
previously handled petitioner's legal matters had been elected to

---

[2] The Loan Agreement was executed to govern both a
$1 million term loan and an "existing $400,000.00 line of credit
originally dated May 15, 1990".  There is no dispute that the
$1 million term loan was provided for petitioner's purchase of
Wagner's stock.  There is no further evidence in the record
concerning the $400,000 line of credit.

a judgeship in early November 1990 and did not render advice or assistance in the transaction.)  The Purchase Agreement, executed on December 20, 1990, between Forest (on behalf of Sharewell) as buyer and Wagner as seller, provided that Wagner would tender his 4,000 shares, constituting 50 percent of the outstanding shares of Sharewell, and that Sharewell would pay to Wagner "As consideration for the tendering of the [4,000] shares" the $1 million in cash; $300,000 in receivables from SDI; and the life insurance policy noted above.  The Purchase Agreement made no mention of a covenant not to compete.

One day later, on December 21, a Certificate of Participation evidencing Wagner's $300,000 participating interest in the Bank's loan to Sharewell was executed by Wagner and the Bank (Certificate of Participation).

Twelve days subsequent to the execution of the Purchase Agreement, on January 1, 1991, after Forest had had the opportunity to examine other noncompete agreements to ascertain their terms and the Christmas holiday had intervened, Forest (on behalf of Sharewell) and Wagner executed a letter agreement denominated a "Non-Compete Agreement" (Noncompete Agreement) drafted by Forest.  In the Noncompete Agreement, Wagner agreed:

> not to engage or participate, directly or indirectly, in any business located on any continent or in any country of the world that is in competition with Sharewell.  The term of this Agreement shall be for a period of three years beginning January 1, 1991 and ending January 1, 1994.

The Noncompete Agreement further provided that:

> It is agreed that as consideration for your [Wagner's] agreement for non-competition * * * Sharewell, Inc. will assign to you $300,000 of the installment receivable from Scientific Drilling, Inc. * * *

The $300,000 in accounts receivable from SDI referred to in the Noncompete Agreement was the same consideration referred to in the Purchase Agreement.  Forest proposed, and Wagner accepted, the allocation of $300,000 to the Noncompete Agreement; they did not negotiate over the dollar amount before agreeing to the allocation.  Forest proposed the $300,000 figure for two reasons. First, $300,000 represented the portion of the consideration that had not been borrowed, but instead was accounts receivable already owed to Sharewell.  Second, Forest believed that, because the accounts receivable would be received in installments over time, he would be in a position to exercise some practical control over payment to Wagner if the covenant were breached, unlike the case with the remaining $1 million in cash being paid out at the time of the buyout.  The parties have stipulated that, in the event the Court determines that any portion of the $1.3 million paid by petitioner to Wagner is allocable to an amortizable covenant not to compete, the value of the Noncompete Agreement is $300,000.

The transaction between Sharewell and Wagner was originally recorded on Sharewell's books as a $1.3 million redemption of

stock. This entry was subsequently amended to reflect the allocation to a covenant not to compete.

At the time he sold his interest in Sharewell, Wagner wanted some respite from the rigors of the day-to-day operations of the company. Both Forest and Fraser believed that Wagner wanted to retire. Wagner was 56 years old and in fair health. He had been diagnosed with a muscle disease 14 years earlier in 1976, but this condition was controlled by medication to the extent that he had at all times maintained a normal work schedule. After leaving Sharewell, Wagner did not experience any significant decline in health. Wagner had substantial personal relationships with important clients of Sharewell, many of whom had been brought in as customers by Wagner, and extensive contacts throughout the drilling industry. At least one such customer indicated he would patronize Wagner if the latter started his own business. Wagner did not attempt to re-enter the drilling business during the period proscribed by the Noncompete Agreement.

On his 1990 Federal income tax return, Wagner reported $1.3 million of consideration received from Sharewell, minus basis of $400, as capital gain.

OPINION

The issue in this case is whether petitioner obtained a covenant not to compete that is valid for Federal income tax purposes.  A covenant not to compete is an intangible asset that may be amortized over its useful life.  See Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21, 48 (1985).  Seeking the benefit of amortization deductions, petitioner argues that $300,000 of the $1.3 million in cash and receivables paid to Wagner in the buyout is allocable to a covenant not to compete.  Respondent argues that the full $1.3 million was paid to Wagner in exchange for his Sharewell stock.  For the reasons discussed below, we agree with petitioner.

Parol Evidence Concerns

In determining whether petitioner and Wagner entered into a valid covenant not to compete, we must first decide what evidence of their agreement incident to the buyout of Wagner we may consider.  Respondent argues that their agreement is contained in the four corners of the Purchase Agreement, which makes no reference to a covenant not to compete, and that the Noncompete Agreement, which does, is parol or extrinsic evidence that cannot be considered under the Danielson rule.  In Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), the Court of Appeals for the Third Circuit precluded a taxpayer's use of extrinsic evidence to

modify the meaning of his written agreement, except in limited circumstances, holding:

>   a party [to an agreement] can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * *

The Danielson rule has been adopted by the Court of Appeals for the Fifth Circuit, see Spector v. Commissioner, 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), to which appeal of this case would lie absent stipulation to the contrary, and so we are bound to apply the Danielson rule in the instant case, see Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

Petitioner argues that the Danielson rule would not operate to exclude extrinsic evidence in this case because such evidence would tend to show mistake. We agree. There is ample evidence to support the proposition that the failure to include a covenant not to compete in the Purchase Agreement constituted a mutual mistake or scrivener's error. Cf. Woods v. Commissioner, 92 T.C. 776 (1989); State Pipe & Nipple Corp. v. Commissioner, T.C. Memo. 1983-339. The record establishes that arrangements for the buyout were made hurriedly against a yearend deadline, without the assistance of an attorney who had previously provided services to petitioner. Both parties to the agreement testified

that they had at all times intended to include a covenant not to compete from Wagner as part of the buyout, and this testimony is corroborated by a third party, their banker. That the terms of the Purchase Agreement were the product of mutual mistake is further supported by circumstantial evidence, such as the insistence on covenants not to compete by a prospective purchaser a few months prior to the transaction at issue and the parties' execution of such a covenant some 12 days after the execution of the Purchase Agreement. The failure to include the covenant in the first writing evidencing the agreement between petitioner and Wagner, i.e., the Purchase Agreement, is consistent with the informality with which other documentation of the transaction was executed. For example, the Loan Agreement was executed on December 12, the Purchase Agreement on December 20, and Wagner's Certificate of Participation on December 21. Clearly, the Certificate of Participation functioned as security for the first two documents, but was not executed until after they were, and neither of the first two was made expressly conditional upon execution of the third. This pattern continued with respect to the delay in executing the Noncompete Agreement, and we believe merely reflects that the parties to the buyout, and their banker, had had extensive prior dealings and trusted each other.

These facts would constitute mutual mistake supporting the reformation of a written contract under the standards of this

Court, see, e.g., <u>Woods v. Commissioner</u>, <u>supra</u>, the Texas courts, see, e.g., <u>Wiseman v. Priboth</u>, 310 S.W.2d 600 (Tex. Civ. App. 1958), or the rule in <u>Danielson</u>; cf. <u>State Pipe & Nipple Corp. v. Commissioner</u>, <u>supra</u> ("The testimony * * * to the extent it was directed at showing mutual mistake, was thus admissible under any standard of proof."). Thus, consideration of the Noncompete Agreement, or other evidence extrinsic to the Purchase Agreement, is not precluded by the <u>Danielson</u> rule because of mutual mistake.

In addition, under the parol evidence rule as applied by Texas courts, the Noncompete Agreement would be an admissible "subsequent agreement". The Supreme Court of Texas has described the parol evidence rule in this way:

> The parol evidence rule is not a rule of evidence at all, but a rule of substantive law.
>
> When parties have concluded a valid integrated agreement with respect to a particular subject matter, the rule precludes the enforcement of inconsistent <u>prior or contemporaneous</u> agreements.
>
> On the other hand, the rule does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof. [<u>Hubacek v. Ennis State Bank</u>, 317 S.W.2d 30, 31 (Tex. 1958); citations omitted; emphasis added.]

As construed by Texas courts, the parol evidence rule does not apply to subsequent agreements. See <u>Lakeway Co. v. Leon Howard, Inc.</u>, 585 S.W.2d 660 (Tex. 1979); <u>Garcia v. Karam</u>, 276 S.W.2d 255 (Tex. 1955). The Noncompete Agreement was not entered prior to

or contemporaneously with the Purchase Agreement, but subsequent to it. Cf. Smith v. Bidwell, 619 S.W.2d 445 (Tex. Civ. App. 1981) (conflicting agreement reached 1 day after entering original written contract is a subsequent agreement for purposes of parol evidence rule). Therefore, the Noncompete Agreement would be admissible in an action between petitioner and Wagner to alter the construction of the Purchase Agreement, and thus the Danielson rule does not operate to preclude our consideration of it in determining what was agreed to by petitioner and Wagner.

Respondent also argues, for the first time on reply brief, that the parol evidence rule applies to the discussions between Forest and Wagner prior to signing the Purchase Agreement and to any other evidence extrinsic thereto. We disagree. When the Noncompete Agreement and Purchase Agreement are compared, an ambiguity in the agreement between petitioner and Wagner emerges. Each writing purports to designate petitioner's $300,000 in accounts receivable from SDI as consideration for a different item—for Wagner's stock in the Purchase Agreement and for Wagner's covenant not to compete in the Noncompete Agreement. The Danielson rule does not preclude consideration of extrinsic evidence where written agreements are ambiguous. See Patterson v. Commissioner, 810 F.2d 562, 572 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Smith v. Commissioner, 82 T.C. 705, 713-714 & n.9 (1984).

Indeed, as we read the decisions of the Court of Appeals for the Fifth Circuit, conflicting <u>written</u> agreements as exist in this case may not even be an appropriate circumstance for invocation of the Danielson rule.  The instant case is not unlike Dixie Fin. Co. v. United States, 474 F.2d 501 (5th Cir. 1973), affg. Empire Mortgage & Inv. Co. v. Commissioner, T.C. Memo. 1971-270, and Stewart v. Commissioner, T.C. Memo. 1971-114, where the Court of Appeals for the Fifth Circuit considered two distinct buyout transactions involving covenants not to compete. The first transaction provided the first occasion for the Court of Appeals to consider whether it should adopt the Danielson rule over the "strong proof" rule of its then-existing precedents. The Court of Appeals found it unnecessary to make the choice.  In the second transaction, the parties to the buyout had entered into a written agreement on an arm's-length basis that made a substantial allocation to a covenant not to compete but 8 months later entered into a written modification of the agreement that allocated only $1 to the covenant.  Notwithstanding its earlier consideration of the Danielson rule, the Court of Appeals did not see fit even to mention a parol evidence rule in connection with its consideration of the two conflicting written agreements.  The Court of Appeals disregarded the second agreement, not because of any parol evidence rule, but because the Court concluded, based upon extrinsic evidence, that the second writing did not reflect

the parties' intent.  See <u>Dixie Fin. Co. v. United States</u>, <u>supra</u> at 505.

Because (i) there is evidence of mutual mistake, (ii) the Noncompete Agreement is a subsequent, not a prior or contemporaneous agreement, in relation to the Purchase Agreement, and (iii) the conflicting Purchase Agreement and Noncompete Agreement are both in writing and read together create an ambiguity, we reject respondent's invocation of the <u>Danielson</u> rule and shall consider all extrinsic evidence in the record in an effort to determine the intent of the parties to the buyout agreement.

Respondent, citing <u>Deshotels v. United States</u>, 450 F.2d 961 (5th Cir. 1971), also argues that petitioner's deductions in connection with the covenant must fail because petitioner is relying on the parol testimony of parties without adverse interests to vary the clear terms of the Purchase Agreement.  In <u>Deshotels</u>, the Court of Appeals for the Fifth Circuit held that, for Federal income tax purposes, a taxpayer cannot establish his claim to a deduction by seeking to controvert the terms of his written contract with parol testimony of parties to the contract that do not have interests adverse to the interpretation being urged.  Forest and Wagner each testified that it was understood by both throughout their negotiations that a covenant not to compete would be required from Wagner as part of the buyout and

that they agreed to allocate $300,000 to it.  Concededly this testimony is self-serving to Forest as petitioner's sole shareholder, and Wagner's position is not tax adverse, because his gain on the transaction is taxed at the same rate for the years in issue whether characterized as capital gain from the sale of stock or ordinary income paid with respect to the covenant.

However, the holding in Deshotels was only that parol testimony of nonadverse parties, standing alone, is insufficient to vary the clear terms of a written contract.  As the Court of Appeals stated:

> Perhaps parol evidence would be enough to tip the scales toward the taxpayer's interpretation in a case where he had offered substantial corroborating evidence in addition to the testimony of the contracting parties in support of his position.  Parol evidence might be sufficient in and of itself if there were strong support on the face of the document for the taxpayer's interpretation; here the words themselves are very clearly in the Commissioner's favor.  We need not decide these questions today.  We hold only that the taxpayer cannot sustain the burden of proving his right to a deduction merely by introducing parol evidence to controvert the traditional state law meaning of the words of a contract affecting the taxpayer's federal tax liability.  [Id. at 967.]

The Court of Appeals has subsequently made clear that such parol testimony, if substantially corroborated, is indeed sufficient to change the terms of a written instrument.  See Sellers v. United States, 615 F.2d 1066, 1067-1068 (5th Cir. 1980).  What distinguishes this case from Deshotels v. United States, supra,

and convinces us to uphold petitioner's position, is that petitioner has introduced substantial corroborating evidence beyond the testimony of Forest and Wagner, the parties to the agreement who lack adversity with respect to the interpretation urged in their testimony. First, the Noncompete Agreement itself, executed 12 days after the Purchase Agreement, is properly in evidence and supports petitioner's contentions. Second, it is undisputed that only months before the buyout of Wagner, a third party, Castex, had sought to purchase petitioner; documentary evidence of that proposed transaction establishes that Castex had sought covenants not to compete from both Forest and Wagner of 5 years' duration in connection with the purchase. Thus, Forest and Wagner would have been freshly reminded of the significance of a noncompete covenant, given the nature of petitioner's business. Most significantly, petitioner's banker, Fraser, testified that it was the Bank's customary practice to require covenants not to compete when providing financing for transactions of this type, and that he had indicated to Forest that the Bank would require a covenant not to compete from Wagner as a condition for providing financing to petitioner.

Faced with this third-party corroboration of Forest's and Wagner's testimony, respondent contends that Fraser provided false testimony in claiming that the Bank required a noncompete covenant as a precondition to financing the buyout. Respondent

bases his contention on the fact that neither the Loan Agreement, which contained a formal integration clause, nor the Loan Worksheet makes any reference to a covenant not to compete.

Respondent's reliance on the Loan Agreement is unconvincing. While it is true that the Loan Agreement formally purports to constitute the entire agreement between the bank and petitioner, and makes no reference to petitioner's obtaining a noncompete covenant, the Loan Agreement also does not mention the $300,000 participation in the loan that was to be purchased by Wagner as a condition to the financing of the buyout. We believe Wagner's $300,000 participating interest was equally, if not more, significant to the Bank's protection as the noncompete covenant, and yet neither is mentioned in the Loan Agreement. Thus we are not persuaded that any negative inference regarding the truthfulness of Fraser's testimony concerning the Bank's requirement of a noncompete covenant can be drawn from the Loan Agreement's failure to mention it.

Respondent is on firmer ground concerning the Loan Worksheet, which does mention Wagner's $300,000 participation in the loan but not any noncompete agreement. However, we believe that the Loan Worksheet's failure to mention a noncompete agreement is a slender reed on which to base a claim that Fraser perjured himself in these proceedings. We find it credible that, because obtaining a noncompete agreement was, as Fraser

testified, a customary practice in such circumstances, it may have been too routine to warrant mentioning in the Loan Worksheet, which itself was an informal, internal document. Based on all of the relevant evidence, including the plausibility of his assertions and his demeanor when testifying, we find Fraser credible and reject respondent's contention that he gave false testimony. Accordingly, Forest's and Wagner's testimony that a covenant not to compete from Wagner was always intended as part of the buyout agreement is corroborated by Fraser's testimony in addition to other evidence. For that reason, this case is distinguishable from Deshotels v. United States, 450 F.2d 961 (5th Cir. 1971).

Economic Reality of Allocation to Noncompete Covenant

Having established that it is appropriate to consider parol testimony and other extrinsic evidence in construing the agreement between petitioner and Wagner, we turn to a consideration of whether petitioner has shown entitlement to the deductions claimed with respect to a covenant not to compete. In connection with the purchase of a business, a taxpayer may amortize a portion of the purchase price if it was intended as payment for a covenant not to compete from a departing shareholder and the amount paid for the covenant reflected economic reality. See Patterson v. Commissioner, 810 F.2d at 571; Better Beverages, Inc. v. United States, 619 F.2d 424, 428

n.5 (5th Cir. 1980); <u>Throndson v. Commissioner</u>, 457 F.2d 1022, 1024-1025 (9th Cir. 1972), affg. <u>Schmitz v. Commissioner</u>, 51 T.C. 306 (1968); <u>Annabelle Candy Co. v. Commissioner</u>, 314 F.2d 1, 8 (9th Cir. 1962), affg. T.C. Memo. 1961-170; <u>Beaver Bolt, Inc. v. Commissioner</u>, T.C. Memo. 1995-549. The instant case raises three questions under the applicable law: (1) Did the buyout agreement between petitioner and Wagner include Wagner's covenant not to compete; (2) did the covenant reflect economic reality; and (3) did the parties to the buyout agreement allocate $300,000 to the covenant?

<u>Did the Buyout Agreement Include Wagner's Covenant Not To Compete?</u>

We find, for much the same reasons that support the consideration of extrinsic evidence, that such evidence convincingly demonstrates that petitioner and Wagner intended Wagner's covenant not to compete to be a part of their buyout agreement when they executed the Purchase Agreement and that the execution of the Noncompete Agreement 12 days later served to correct a mutual mistake. Wagner and Forest both testified that a covenant was always contemplated in their negotiations for the buyout, and their banker's testimony corroborates that it was an essential part of the buyout agreement. As discussed in greater detail in connection with the parol evidence concerns, the surrounding circumstances strongly support the testimony, because

they illustrate the parties' likely awareness of the importance of a noncompete agreement. We think the evidence clearly rebuts respondent's contention that the Noncompete Agreement was a mere "afterthought", prompted entirely by tax considerations. Rather, we think the evidence shows that there were substantial business reasons for a noncompete agreement from Wagner, and that it would have been highly unlikely, and imprudent, for petitioner not to seek one.

Did the Covenant Not To Compete Reflect Economic Reality?

The requirement that the covenant reflect economic reality or have economic substance has been articulated as follows: "[T]he covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). Courts consider a number of factors in determining whether a covenant has economic substance, including the following: (a) The seller's (i.e., covenantor's) ability to compete; (b) the seller's intent to compete; (c) the seller's economic resources; (d) the potential damage to the buyer posed by the seller's competition; (e) the seller's business expertise in the industry; (f) the seller's contacts and relationships with customers, suppliers, and other business contacts; (g) the buyer's interest

in eliminating competition; (h) the duration and geographic scope of the covenant; (i) enforceability of the covenant not to compete under State law; (j) the age and health of the seller; (k) the seller's intent to reside in the same geographical area; and (l) the existence of active negotiations over the terms and value of the covenant not to compete. See Beaver Bolt, Inc. v. Commissioner, supra, and cases cited therein.

In stipulating that the Noncompete Agreement had a value of $300,000, respondent has largely conceded its economic reality, in our view. Nevertheless, on brief respondent continues to insist that the Noncompete Agreement lacked economic substance because Wagner intended to retire and was constrained in any event by his $300,000 participation in the loan financing his buyout. We are not persuaded. Petitioner's customers represented a highly specialized, niche market, and Wagner was well known to them. A prospective purchaser of petitioner in the same year as Wagner's buyout had insisted on noncompete agreements from both Wagner and Forest. Regardless of whether Wagner "intended" to retire after the buyout, he was 56, might have second thoughts, and had received $1 million that could finance a new venture. Indeed, if Wagner did not represent a competitive threat, we wonder why the Bank found it necessary to require Wagner's participation in the loan. Respondent in effect contends that Wagner's loan participation made the Noncompete

Agreement "unnecessary" and therefore lacking in substance, but we see nothing remarkable in petitioner's and the Bank's "belt and suspenders" approach of wanting both.  Finally, respondent argues that the Noncompete Agreement lacked substance because it was unenforceable under Texas law, due to its overly broad scope.  Petitioner responds, and we agree, that Texas courts would reform an overly broad covenant.  See Tex. Bus. & Com. Code Ann. sec. 15.51(c) (West 1990); Justin Belt Co. v. Yost, 502 S.W.2d 681 (Tex. 1974).  Thus we conclude the Noncompete Agreement reflected economic reality.

Did the Parties Allocate $300,000 to the Covenant Not To Compete?

The final and most difficult question concerns whether petitioner has shown that petitioner and Wagner agreed to allocate $300,000 to the Noncompete Agreement.  That Wagner's covenant was indispensable to the buyout agreement does not necessarily prove that the parties agreed to allocate any specific portion of the consideration to it.  See Better Beverages, Inc. v. United States, 619 F.2d at 429-430; Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F.2d 316, 317 (3d Cir. 1967), affg. per curiam T.C. Memo. 1966-6; Annabelle Candy Co. v. Commissioner, 314 F.2d at 7.  This might be true even where the covenant was objectively worth the amount amortized, as has been stipulated here.  Petitioner must still show that the parties to the buyout agreed to allocate the specific amount

claimed to be amortizable. "The taxpayer must prove what, if anything, he actually was required to pay to obtain the item, not what he would have been willing to pay or even what the market value of the item was." Better Beverages, Inc. v. United States, supra at 428. Where, as here, the parties to an agreement are not tax adverse as to the amount allocated to a covenant not to compete, such allocation warrants strict scrutiny. See Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959).

Petitioner concedes that Forest and Wagner did not negotiate with respect to the allocation of $300,000 to the covenant not to compete. Moreover, Wagner reported the entire proceeds from the transaction as capital gain. The fact remains, however, that Forest proposed and Wagner accepted a $300,000 allocation, as memorialized in the Noncompete Agreement. The cases relied on by respondent, Better Beverages, Inc. v. United States, supra; Annabelle Candy Co. v. Commissioner, supra; Major v. Commissioner, 76 T.C. 239 (1981); and Delsea Drive-In Theatres, Inc. v. Commissioner, T.C. Memo. 1966-6, affd. 379 F.2d 316 (3d Cir. 1967), are thus readily distinguishable. In those cases, no express allocation had been made to the covenant; the purchaser

made a subsequent, unilateral allocation, without the seller's knowledge or consent.

Based on the record in this case, we think the allocation was the product of a bargained-for exchange. We think it is more likely that Wagner's reporting position reflected a lack of awareness of the covenant's tax significance than a belief that no amount had been allocated to the covenant. We find significant in reaching our conclusion the fact that the allocation was not just a division of the total consideration; it was an allocation between cash payable at closing and assigned accounts receivable to be paid in the future. Forest testified that he wished to allocate the $300,000 in accounts receivable from SDI to the Noncompete Agreement because it was the only portion of the consideration that was not borrowed and immediately payable to Wagner, but instead would be paid in installments in the future--giving Forest some practical recourse, in his view, if Wagner subsequently breached the covenant. We accept Forest's explanation and find that it demonstrates that Wagner had a position adverse to the allocation agreed to, for nontax reasons. It would have been somewhat more advantageous to Wagner to allocate the cash consideration, or a portion thereof, to the covenant so that in the event Forest were to consider the covenant breached, Forest would be less likely to attempt to revoke the assignment of the receivables. These

nontax considerations underlying the particular allocation of $300,000 to the covenant are probative regarding whether the allocation should be treated as bargained for by the parties, and on balance we are persuaded that it should, even under a standard of strict scrutiny. Therefore we conclude that petitioner has shown that an allocation of $300,000 to the covenant not to compete was intended by the parties.

Based on the foregoing, we shall not sustain respondent's determination disallowing petitioner's deductions with respect to a covenant not to compete.

Accuracy-Related Penalties

Because we do not sustain respondent's disallowance of petitioner's amortization deductions, there is no underpayment in this case, and petitioner is not liable for accuracy-related penalties under section 6662(a).

To reflect the foregoing,

Decision will be entered

for petitioner.